VALCO CINCINNATI, INC., APPELLEE, *v.* N & D MACHINING SERVICE, INC., D.B.A. SUPERIOR ADHESIVE EQUIPMENT CO., ET AL., APPELLANTS.

[Cite as Valco Cincinnati, Inc. v. N & D Machining Service, Inc. (1986), 24 Ohio St. 3d 41.]

(No. 85-280—Decided May 21, 1986.)

*Frost & Jacobs* and *David E. Schmit,* for appellee.

*Strauss, Troy & Ruehlmann Co., L.P.A., Charles G. Atkins, Elizabeth A. McCord* and *Randall W. Knutti,* for appellants.

HOLMES, J.   There are two issues presented upon appeal. The first is whether the trial court had sufficient evidence to support its findings that Valco's plans, materials, designs, processes, customer and pricing lists were all protected trade secrets. The second inquiry is whether the trial court abused its discretion by, in effect, *permanently* enjoining appellants from the manufacture of any valve components which might be interchanged or substituted for a Valco part. For the following reasons, we affirm the courts below.

Initially, the legal nature of the term "trade secret" must be analyzed. Ohio's courts have adopted the definition of "trade secret" found in IV Restatement of Torts (1939) 1, Section 757. Accordingly, R.C. 1333.51(A)(3) states that:

" 'Trade secret' means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers, which has not been published or disseminated, or otherwise become a matter of general public knowledge. Such * * * is presumed to be secret when the owner thereof takes measures designed to prevent it, in the ordinary course of business, from being available to persons other than those selected by the owner to have access thereto for limited purposes."

As pointed out by Judge Black in his well considered appellate opinion below, a further elucidation of what constitutes a trade secret is to be found within Comment (*b*) to the above section which, in pertinent part states:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management." *Id.* at 5.

It must be pointed out that Ohio has statutorily prohibited employees, in broadest terms, from disseminating or disclosing confidential matters of

the employer without the knowledge and consent of the latter. R.C. 1333.81 provides as follows:

"No employee of another, who in the course and within the scope of his employment receives any confidential matter or information, shall knowingly, without the consent of his employer, furnish or disclose such matter or information to any person not privileged to acquire it."

Construing Ohio's trade secret law, the Supreme Court of the United States, in *Kewanee Oil Co.* v. *Bicron Corp.* (1974), 416 U.S. 470 [69 O.O.2d 235], noted at 481 that one of the stated policies of such trade secret law is "[t]he maintenance of standards of commercial ethics * * *."

Often cited as explaining the nature of a trade secret is the opinion of Justice Oliver Wendell Holmes in *E.I. Du Pont de Nemours Powder Co.* v. *Masland* (1917), 244 U.S. 100, wherein it was observed that trade secret laws are not those of property but the equitable principles of good faith applicable to confidential relationships. The employer who has discovered or developed trade secrets is protected against unauthorized disclosure or use, not because he has a property interest in the trade secrets but because the trade secrets were made known to the employee in a confidential relationship.

Generally, under trade secret statutes, that which is proscribed is the misappropriation of the information obtained from the person holding the trade secret, whether such secret is obtained without the owner's consent, or originally with the owner's consent, and later converted to the use and gain of the one obtaining the secret. Accordingly, R.C. 1333.51 provides in part:

"(B) No person shall, with intent to deprive or withhold from the owner thereof the control of a trade secret, or with intent to convert a trade secret to his own use or the use of another, obtain possession of or access to an article representing a trade secret.

"(C) No person, having obtained possession of an article representing a trade secret or access thereto with the owner's consent, shall convert such article to his own use or that of another person, or thereafter without the owner's consent, make or cause to be made a copy of such article, or exhibit such article to another.

"(D) No person shall, by force, violence, threat, bribe, reward, or offer of anything of value on or to another person or member of his family, obtain or attempt to obtain from such other person an article representing a trade secret."

In contrast, a proper means of obtaining the information contained within a trade secret may be by way of (1) discovery by independent invention; (2) discovery by "reverse engineering," that is, by starting with the known product and working backward to find the method by which it was developed, the acquisition of the product having been by a fair and honest means, such as purchase of the item on the open market; (3) discovery under a license from the owner of the trade secret; (4) observation of the

item in public use or on display; or by (5) obtaining the trade secret from published literature.[1]

Underlying almost every case in which a former employee is accused of the unauthorized disclosure or use of trade secrets is the matter of balancing or reconciling "* * * the conflicting rights of an employer to enjoy the use of secret processes and devices which were developed through his own initiative and investment and the right of employees to earn a livelihood by utilizing their personal skill, knowledge and experience." *GTI Corp.* v. *Calhoon* (S.D. Ohio 1969), 309 F. Supp. 762, 768 [53 O.O.2d 74]; Annotation (1970), 30 A.L.R. 3d 631, 636, Section 2(a). A balancing of these two interests may be facilitated by distinguishing between knowledge and skill that is general in the trade as a whole and "secret" knowledge which is acquired particularly and specifically from the employer.

Concerning the issue of whether the disputed items were in fact trade secrets, Valco presented evidence that its specifications utilized for parts comprising the valve and glue applicator head resulted in unique tolerances at certain critical areas of their product. As to the materials utilized in the valve and applicator, Valco's evidence showed that it had selected specific materials only after considerable experimentation, testing and field experience had demonstrated the desired quality and reliability of the parts and the total product. This selection process often required years of testing, over many product lives and incremental variations to finally achieve a material improvement. There seemingly was an absence of evidence that others in the industry or the public, generally, knew of the particular types of materials used in Valco's products.

As to the uniqueness of Valco's manufacturing processes, claimed to be protectable trade secrets, there was conflicting evidence adduced by the parties. One of the secrets claimed by Valco, with evidence adduced in support, was the knowledge that special care must be used in assembling the diaphragm restrainer and stem screw. In order to accomplish this special type of assembly, a unique assembling fixture was produced. There was evidence that the end face of the cone spring used in the glue applicator had to be ground in a certain manner, and that such spring had to be of a certain type of metal. Also, it was asserted that certain care and skill had to be utilized in the drilling of the glue inlet and output parts of the valve.

In all of these respects, the trial court found, and the court of appeals affirmed, that Valco's materials and manufacturing processes were unique to its products in that no competitor made products exactly like Valco's, and that such products were developed only after a great deal of experimentation, testing and field experience.

As previously noted, a trade secret cannot be acknowledged as such

---

[1] See, *e.g.,* La. Rev. Stat. Section 51:1431, Comment (a) (West Supp. 1986), at 396-397.

unless the manufacturer has initiated measures designed to insure the security of those things considered trade secrets. In the present case, there was considerable evidence offered to show that Valco had taken reasonable and active steps to protect and safeguard its trade secrets. There was testimony that Valco's plant had more than adequate locking devices; that there was a receptionist who screened every visitor to the building; that a buzzer lock system on the door to the processing area was operated by the receptionist; that the general public was never taken through the plant; that competitors were never authorized within the plant; that Valco's drawings were made available to their suppliers only for the limited purpose of bidding on, or manufacture of certain parts; that the drawings were made available only to the employees with a specific need for them; that all drawings which left the Valco plant were required to have a proprietary marking restricting the use and disclosure thereof; and that a shredder was utilized to destroy all computer printouts and old pricing sheets. There was evidence that the company employed only twenty-five to thirty people and it therefore was unnecessary to utilize identification or security badges, in that all of the employees knew each other. The record showed that the company had a policy of obtaining non-disclosure agreements from its key employees, and that, in the main, such would be obtained, but that former employees Draginoff, Michael Markarian, and Perry Bensick had refused to sign such an agreement.

Upon all of the above evidence, we hold that the trial court quite properly concluded that, under the circumstances, Valco had taken reasonable precautions to protect the secrecy of its information and to prevent it from being made available to persons other than those permitted by Valco.

While all the issues were actively contested, the question of whether a particular knowledge or process is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence. A reviewing court should not substitute its judgment for that of the trial court on these factual issues. *Water Management, Inc.* v. *Stayanchi* (1984), 15 Ohio St. 3d 83, 86; *Kinney* v. *Mathias* (1984), 10 Ohio St. 3d 72, 73.

As one of their issues upon appeal, the appellants present the argument that the injunction issued by the trial court denied them the equal protection of the law, not only as to the breadth of the injunction, but also as to its duration. Although Ohio's trade secret statutes do not contain any specific provisions for providing injunctive relief to protect against the conversion or misappropriation of trade secrets, injunctions are, of course, the appropriate remedy to restrain the continued and future use, or threatened use, of misappropriated trade secrets.[2] The injunctive order

---

[2] See, *e.g.,* Uniform Trade Secrets Act, Injunctive Relief (1980), 14 U.L.A. 541, 544, Section 2, which provides in part:

"(a) Actual or threatened misappropriation may be *enjoined.* Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the in-

may, in order to do equity, be as broad as reasonably thought necessary to place the injured party in the position that he would have been in had the misappropriation not taken place. Although punitive, perpetual injunctions have previously been granted. See, *e.g., Elcor Chemical Corp.* v. *Agri-Sul, Inc.* (Tex. Civ. App. 1973), 494 S.W. 2d 204, 213. The law in the field would tend to indicate that the duration of the orders is generally limited to the extent of the time advantage gained by the misappropriator over good faith competitors, who could have gained knowledge of the trade secret by lawful and good faith means. See, *e.g., K-2 Ski Co.* v. *Head Ski Co., Inc.* (C.A. 9, 1974), 506 F. 2d 471, 474.

The trial court in this case issued an order which prohibited not only the production of parts interchangeable with Valco's parts, but also the buying or selling of any such parts made by others. Such an order may be considered punitive in nature, but we hold such not to be unreasonable as a sanction for this particular misappropriation. The appellants were not prohibited from manufacturing or dealing in parts that could be used interchangeably with other commercial glue applicators manufactured by other competitors. Therefore, the appellants are not foreclosed from doing business generally within this commercial field. We hold that such enjoinder does not in any manner violate the appellants' constitutional rights of equal protection guaranteed by the Fourteenth Amendment. There is no constitutional bar to the issuance of an injunction against unlawful use of confidential business information.

As noted hereinabove, it is well-established that the trade secret policies in Ohio are to maintain standards of commercial ethics and the encouragement of invention, as well as the protection of the substantial investment of employers in their proprietary information. See, *e.g., Kewanee Oil Co., supra.* The underlying purposes of the injunction in this case are: to prevent appellants from being unjustly enriched, to prevent Valco's secrets from being disclosed to the public without its consent, to penalize appellants for their unethical and unlawful behavior, and to protect Valco's investment in its proprietary information. These are all legitimate state goals and are neither arbitrary nor capricious.

As to the duration of injunctive orders, such should generally terminate when a former trade secret becomes either known to good faith competitors, or is obtained by them because of the lawful availability of products that can be reverse engineered to reveal such trade secrets, subject to any additional period of restraint necessary to negate lead time acquired by the misappropriator. The trial court, in its analysis of the particular facts of the case, may determine that the circumstances were so egregious and violative of the relationship of the parties involved within

junction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." (Emphasis added.)

the misappropriation that the ultimate sanction of a permanent injunction prohibiting the use of such unlawfully obtained commercial information might well be in order.

In the case here, there was evidence adduced to show the close relationship of the appellee company and the appellant James Draginoff who had worked his way into a position of confidentiality and management with the employer company. He had been granted the opportunity to form another company to produce certain products which would serve the needs of his employer, and he had been entrusted with confidential information and technical tools so as to provide assistance to that company. These confidences were violated in the guise of carrying out the agreed-upon relationship. This we hold to be a sufficiently egregious circumstance to provide the trial court with the basis for its permanent order. We conclude that the trial court did not abuse its discretion in this regard.

Based upon all the foregoing, we hereby affirm the judgment of the court of appeals.

*Judgment affirmed.*

CELEBREZZE, C.J., SWEENEY, LOCHER, C. BROWN and DOUGLAS, JJ., concur.

WRIGHT, J., concurs in part and dissents in part.

WRIGHT, J., concurring in part and dissenting in part. I concur with the majority holding that sufficient evidence supported a finding of a misappropriation of trade secrets. I would limit this court's holding, however, to the first paragraph of the syllabus. As Justice Holmes points out, injunctive relief is awarded in trade secret cases in order to place the injured party in the position he would have been in but for the misappropriation. In my view a perpetual, punitive injunction does not serve this laudable purpose. Further, this type of injunctive relief conflicts with the public interest in promoting competition and in allowing employees to benefit from their knowledge and abilities. *Brunswick Corp.* v. *Outboard Marine Corp.* (1980), 79 Ill. 2d. 475, 404 N.E. 2d 205, 207.

Injunctive relief is generally limited to the period of time required for independent development by good faith competitors.[3] The injunction

---

[3] See Uniform Trade Secrets Act, Section 2(a), 14 U.L.A. 288 (1986 Cum.); *Conmar Products Corp.* v. *Universal Slide Fastener* (C.A. 2, 1949), 172 F. 2d 150; *Hampton* v. *Blair Mfg. Co.* (C.A. 8, 1967), 374 F. 2d 969, 973; *Northern Petrochemical Co.* v. *Tomlinson* (C.A. 7, 1973), 484 F. 2d 1057, 1060; *K-2 Ski Co.* v. *Head Ski Co.* (C.A. 9, 1974), 506 F. 2d 471, 474; *SI Handling Systems, Inc.* v. *Heisley* (C.A. 3, 1985), 753 F. 2d 1244, 1266; *Sperry Rand Corp.* v. *Electronic Concepts, Inc.* (E. D. Va. 1970), 325 F. Supp. 1209, 1219, affirmed except as to award of attorney fees and computation of damages *sub nom. Sperry Rand Corp.* v. *A-T-O, Inc.* (C.A. 4, 1971), 447 F. 2d 1387; *Carborundum Co.* v. *Williams* (E. D. Tenn. 1978),

would terminate once the trade secret becomes either generally known to good faith competitors or generally knowable to them because of the lawful availability of products subject to reverse engineering. Uniform Trade Secrets Act, Section 2, Commissioners' Comment (14 U.L.A. 544 [1980]). The standard for injunctive relief I advocate eliminates the commercial advantage or "headstart" obtained by the misappropriator and places the injured party in the position he would have been in had the misappropriation not occurred. If a punitive measure is appropriate in a particular case, the owner of a trade secret has an adequate remedy by seeking money damages in place of or in addition to injunctive relief. See Uniform Trade Secrets Act, Section 3 (14 U.L.A. 289 [1986 Cum.]); see, generally, 12A Milgrim on Trade Secrets (1985), Section 7.08[3].

To the extent that the majority approved the granting of a perpetual injunction, I respectfully dissent.

---

468 F. Supp. 38, 42, affirmed mem. (C.A. 6, 1978), 590 F. 2d 334; *Anaconda Co.* v. *Metric Tool & Die Co.* (E.D. Pa. 1980), 485 F. Supp. 410, 431; *Brunswick Corp.* v. *Outboard Marine Corp.* (1980), 79 Ill. 2d 475, 404 N.E. 2d 205, 207; *Space Aero Products Co.* v. *R. E. Darling Co.* (1965), 238 Md. 93, 208 A. 2d 74, 91, rehearing denied (1965), 238 Md. 129, 208 A. 2d 699, certiorari denied (1965), 382 U.S. 843; *USM Corp.* v. *Marson Fastener Corp.* (1984), 392 Mass. 334, 467 N.E. 2d 1271, 1275-1276, 1285-1286; *Carboline Co.* v. *Jarboe* (Mo. 1970), 454 S.W. 2d 540, 552-553; *Weed Eater, Inc.* v. *Dowling* (Tex. Civ. App. 1978), 562 S.W. 2d 898. See, generally, 12A Milgrim on Trade Secrets (1985), Section 7.08.