In re URGENT MEDICAL
CARE, INC., Debtor,

In Joint Administration With Primary
Medical Associates, Inc.,

T. William Evans, Ruth
A. Evans, Debtors.

URGENT MEDICAL CARE,
INC., Plaintiff,

v.

Dale BUGAY, Occupational Health Plan,
Inc., and The Ohio State University,
dba MedOhio Physician Care Centers,
Defendants.

Bankruptcy Nos. 2–91–06691, 2–
91–06692 and 2–02–06693.
Adv. No. 2–93–0125.

United States Bankruptcy Court,
S.D. Ohio, E.D.

May 3, 1993.

John A. Sentz, Jr., Robins, Preston, Beckett, Taylor & Gugle Co., L.P.A., Columbus, OH, for defendants Occupational Health Plan, Inc., et al.

John P. Gartland, Yvette A. Cox, Arter & Hadden, Columbus, OH, for plaintiff.

Kathleen M. Trafford, James D. Curphey, Porter, Wright, Morris & Arthur, Columbus, OH, for the Ohio State University dba MedOhio Physician Care Centers.

### OPINION AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION

BARBARA J. SELLERS, Bankruptcy Judge.

On April 8, 1993, Urgent Medical Care, Inc. ("UMCI"), a Chapter 11 debtor in pos-

session before this Court, filed a verified complaint seeking a preliminary and permanent injunction against Occupational Health Plan, Inc. ("OHP") and Dale Bugay ("Bugay"). Ohio State University, dba MedOhio Physician Care Centers, subsequently intervened as a defendant ("MedOhio"). (OHP, Bugay and MedOhio collectively are referred to as "Defendants.") On April 20 and 21, 1993 the Court heard UMCI's request for a preliminary injunction against OHP, Bugay and MedOhio. The Court further heard closing arguments from all parties on April 22, 1993.

The Court has jurisdiction in this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding under 28 U.S.C. § 157(b)(2) which this bankruptcy judge can hear and determine. The following constitute findings of fact and conclusions of law on UMCI's request for a preliminary injunction.

## I. *Findings of Fact*

1. Defendant Bugay was employed by UMCI from 1989 until October of 1991. At the time of his employment UMCI had a substantial occupational health care practice. Bugay had no prior professional relationship in 1989 with any company then utilizing UMCI for occupational health services. Bugay was hired by UMCI to oversee and market UMCI's occupational health care practice.

2. UMCI filed a voluntary petition for relief under Chapter 11 on September 5, 1991. Shortly thereafter, at the request of T. William Evans, the owner and president of UMCI, Bugay formed the corporation known as OHP for the express purpose of providing the same administrative and marketing services for UMCI as Bugay had performed as an employee. In that effort certain employees of UMCI became employees of OHP. UMCI transferred its occupational health care records to OHP and OHP and its employees managed and administered the non-medical side of UMCI's occupational health practice.

3. In the course of his employment and after OHP was formed, Bugay and OHP were privy to certain of UMCI's proprietary information. This information included "green sheets" (client profiles and treatment practices), key financial information, fee schedules and the identity of employers who used UMCI's services for their employees. UMCI intended that such information remain confidential and Bugay understood and apparently accepted that intention.

4. Neither Bugay nor OHP had any covenant not to compete or any written agreement regarding the confidentiality of UMCI's employer client list or other proprietary information. Further, neither Bugay nor OHP had any written contract for its services to UMCI. UMCI's relationship with OHP was essentially on a month to month basis. After 1991 OHP also serviced less extensive occupational health programs for two other providers.

5. Between October 1991 and March 1993 Bugay, on behalf of OHP, shared certain of UMCI's proprietary information with a competitor of UMCI, MedOhio. Those disclosures were made to assist OHP in obtaining a contract with MedOhio to manage its occupational health care program. UMCI was unaware of Bugay's contacts with and disclosures to MedOhio until sometime during the first quarter of 1993. UMCI represented to MedOhio that it had a "book of business" which it believed would come to MedOhio from a contract with OHP. That "book of business" included the occupational health needs of the employees of UMCI's employer clients.

6. OHP executed a contract with MedOhio on March 3, 1993. On March 17, 1993, OHP informed UMCI that the relationship between OHP and UMCI would be terminated at the end of March. Although OHP's function was critical to UMCI's business operations, OHP gave UMCI only a two-week notice of the termination of their business relationship. At an exit interview with Dr. Zeeb of UMCI on March 18, 1993, Bugay apparently agreed that the information referenced in paragraph 3 was UMCI's and that he would not solicit UMCI's employer clients.

7. Upon termination of OHP's relationship with UMCI, Bugay, on behalf of OHP, sent a letter to UMCI's employer clients. That letter stated that OHP had terminated its relationship with UMCI and that OHP would be providing occupational services only through MedOhio. The letter was understandably confusing and perhaps misleading to UMCI's employer clients with regard to UMCI's continued role in providing occupational health care services to employees of those clients. OHP also invited certain of UMCI's employer clients to an "open house" at a newly reopened center of MedOhio. UMCI now fears that it will lose the business of these employer clients and seeks to enjoin OHP, Dale Bugay, and MedOhio from providing occupational health services to those persons who were employer clients of UMCI on March 17, 1993.

## II. *The Standard for Issuance of a Preliminary Injunction*

There are four factors the Court must consider when determining whether a preliminary injunction should issue: (1) the plaintiff's likelihood of success on the merits; (2) whether the injunction will prevent irreparable harm to the plaintiff; (3) the harm, if any, to others as a result of the injunction; and (4) the public interest, if any, served by the injunction. *Unsecured Creditors' Committee of DeLorean Motor Company v. DeLorean (In re DeLorean Motor Company)*, 755 F.2d 1223, 1228 (6th Cir.1985). The *DeLorean* court also held that these facts should be balanced and not considered "prerequisites that must be met." 755 F.2d at 1129.

## III. *The Positions of the Parties*

UMCI seeks a preliminary injunction to enjoin Bugay, OHP and, by intervention, MedOhio from using certain "proprietary information" which UMCI characterizes as "trade secrets" under Ohio Revised Code § 1333.51(A)(3). UMCI contends that its "green sheets," financial information and data, fee schedules and, most specifically, its client lists all are "trade secrets." UMCI concludes that because Bugay and OHP misappropriated this proprietary information, an injunction is necessary to prevent harm to UMCI from further misappropriation and to redress the violations of confidentiality which have occurred.

The Defendants contend that no injunction is warranted because Bugay and OHP did not misappropriate any "trade secrets" of UMCI. The Defendants further contend that Bugay and OHP did not physically take most of the information UMCI characterizes as trade secrets, i.e. the "green sheets," fee schedules, marketing and business plans or financial reports. The Defendants admit that an employer client mailing matrix which includes UMCI clients was used by OHP after its business relationship with UMCI terminated.

The Defendants also dispute UMCI's contention that any of this information was confidentially maintained by UMCI. The Defendants contend that general confidentiality instructions by UMCI's officers to its employees were insufficient to protect the client lists, protocol sheets, fee schedules or financial information as trade secrets as such are defined by Ohio Revised Code § 1333.51. Because this information does not rise to the level of trade secrets and because neither Bugay nor OHP was bound by any agreement not to compete with UMCI, the Defendants conclude that no basis exists to restrain them from soliciting UMCI's employer clients.

## IV. *Issues Before the Court*

The Defendants' arguments oversimplify the facts presented to the Court. Only a portion of UMCI's complaint involves the alleged unauthorized use of trade secrets after OHP terminated its business relationship with UMCI. An equally important issue involves whether Bugay and OHP, while still in a business relationship with UMCI, used proprietary information belonging to UMCI for the advantage of OHP.

## V. *Conclusions of Law*

### A. *"Trade Secrets" Under Ohio Law.*

Section 1333.51(A)(3) of the Ohio Revised Code defines a "trade secret" as follows:

(3) "Trade secret" means the whole or any portion or phase of any scientific or technical information, design, pro-

cess, procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers, which has not been published or disseminated, or otherwise become a matter of general public knowledge. Such scientific or technical information, design, process, procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers is presumed to be secret when the owner thereof takes measures designed to prevent it, in the ordinary course of business, from being available to persons other than those selected by the owner to have access thereto for limited purposes.

■ This definition adopts the position set forth in IV Restatement of Torts (1939) 1, Section 757. *See Valco Cincinnati, Inc., v. N & D Machining Service, Inc.*, 24 Ohio St.3d 41, 44, 492 N.E.2d 814 (1986). The court in *Valco* relied upon comment (b) to § 757 to provide further insight into what constitutes a "trade secret."

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

* * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

■ The *Valco* court also examined the history relating to the protection of trade secrets and reasoned that equally important is the protection of the confidential relationship in which the trade secret is disclosed. 24 Ohio St.3d at 45, 492 N.E.2d 814. Additionally, protection of a trade secret promotes acceptable standards of commercial ethics and notions of fair dealing. *Valco*, 24 Ohio St.3d at 45, 492 N.E.2d 814, citing *Kenwanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). The countervailing policy concerns are those of the former employee or agent's freedom to earn a living and the protection of the competitive process in our society.

■ There is, however, no presumption that information is a trade secret. *Water Management, Inc. v. Stayanchi*, 15 Ohio St.3d 83, 472 N.E.2d 715 syllabus paragraph one (1984). The party asserting the trade secret must take "active steps to maintain the secrecy." *Stayanchi*, 15 Ohio St. at 84, 472 N.E.2d 715 syllabus paragraph one. *See, also*, Ohio Revised Code § 1333.51(A)(3). Paragraph two of the syllabus in *Stayanchi* is equally important and holds:

Applying R.C. 1333.51(A)(3), a trial court should examine those facts which show the extent to which information is known outside the business and the precautions taken to guard the secrecy of the information.

*Stayanchi*, 15 Ohio St.3d at 84, 472 N.E.2d 715.

With these principles in mind the Court will examine each item UMCI contends is a trade secret.

### 1. *"Green Sheets," Financial Data and Fee or Rate Schedules.*

■ The Court finds that UMCI took sufficient steps to preserve the confidential nature of information contained in its "green sheets," financial reports and fee schedules to bring these items within the ambit of "trade secrets" as set forth in Ohio Revised Code § 1333.51(A)(3). The evidence established that this information was not generally known outside of UMCI

and that steps were taken to limit and protect access to those documents within UMCI. Characterization of these items as "trade secrets," however, is less important to the Defendants than is the characterization of the client list. The Defendants have indicated that they do not currently have the "green sheets" or the information thereon, nor do they have or have use for UMCI's financial reports or fee schedules. The evidence established that the Defendants do not intend to use any of the segments of this information which was shown to them during the MedOhio/OHP negotiations on a go-forward basis and the purpose for which such information was shown to MedOhio was to demonstrate that OHP serviced the volume of occupational health care business that OHP represented it serviced. Accordingly, any relief which prohibits the use of these items by the Defendants is essentially unopposed.

## 2. *The Employer Client List.*

■ Most important to all parties in this adversary proceeding is the characterization and potential use of the list which contains the names, addresses and contact persons for employer clients that have previously used UMCI as their health care provider for occupational health services. The parties initially dispute ownership of this list; however, the Court finds that that client list rightfully belongs to UMCI and that Bugay, on behalf of OHP, apparently agreed with that assessment at his exit interview on March 18, 1993.

UMCI provides occupational health care services to a large number of major employers throughout the Columbus area. Before the incorporation of OHP, Bugay, as an employee of UMCI, provided certain managerial and marketing services for UMCI with regard to these clients and their employees. OHP, upon its incorporation in October of 1991, took over the duties which had been performed by Bugay and certain other employees of UMCI. Prior to and after October 1991 UMCI has been the ultimate provider of the occupational health services for the employees of these clients.

Before Bugay began his employment with UMCI, UMCI provided occupational health care services for many of these employer clients. Bugay, as an employee, merely managed and developed this business. There was no evidence to indicate that UMCI intended to give its clients to OHP to service through whatever health care provider OHP might select. Rather, the more sensible view of the evidence is that UMCI intended OHP to provide managerial and administrative services for UMCI's employer clients and their employees in the same manner that Bugay and other former employees of UMCI had performed those services while employed by UMCI.

Even though the Court finds that the employer client list belongs to UMCI, it does not automatically follow that the list is a trade secret within the definition of Ohio Revised Code § 1333.51(A)(3). The employer client list does not contain information which rises to the level of confidentiality such that it qualifies as a trade secret. It is merely a list of clients who use UMCI to provide occupational health care services for their employees. Absent additional information about the employer's requirements and preferences, which information appears only on the "green sheets," the list alone does not constitute a trade secret. The identity of these employer clients is simply a list of much of the universe of business employers likely to need occupational health care services in Central Ohio. Such information is readily available from other sources and is not a "secret." *See Commonwealth Sanitation v. Commonwealth Pest Control,* 20 O.O.2d 462, 178 N.E.2d 518 (Ct.App.1961).

Additionally, UMCI did not present sufficient evidence to establish any substantial "precautions taken to guard the secrecy" of the customer list. *Stayanchi,* 15 Ohio St.3d 83, 472 N.E.2d 715, syllabus paragraph two. The only evidence of precautions presented by UMCI was that the list was kept in the computer maintained by OHP; it was not available to all employees; and general confidentially was requested of all UMCI employees. UMCI was unable to demonstrate specific steps it took to insure

that its employer client list would not be disseminated to third parties. Indeed, testimony established that OHP's employees were not given confidentiality instructions by UMCI regarding the list of employer clients. This failure, combined with the Court's finding that the information on the customer list is readily available from other sources, means the employer client list is not a "trade secret."

### B. The Relationship Between OHP and UMCI.

#### 1. The Nature of the Relationship.

■■■ Bugay and OHP contend that they were not agents of UMCI, but rather that OHP was legally only an independent contractor with UMCI. Agents and independent contractors are distinguished by the degree of control or right of control retained by the principal. *Councell v. Douglas,* 163 Ohio St. 292, 126 N.E.2d 597 syllabus paragraph one (1955) and *Hanson v. Kynast,* 24 Ohio St.3d 171, 494 N.E.2d 1091 syllabus paragraph one (1986). Right to control is sometimes more important than actual control.

■■■ The evidence established that the essential nature of the relationship between UMCI and Bugay did not change when Bugay formed his corporation and contracted with UMCI. Bugay, when an employee of UMCI, had provided certain managerial, marketing and administrative services which were inextricably intertwined with the occupational health care services provided by UMCI to the employees of UMCI's employer clients. There is no dispute that as an employer, UMCI had the right to control its employee, Bugay, regarding matters concerning the employment. The services provided to UMCI and its clients by OHP after its incorporation in October 1991, were essentially the same as those provided by Bugay and other UMCI personnel as employees. Further, there was no evidence that UMCI intended to relinquish its right to control Bugay's or OHP's services to UMCI when the characterization of the relationship changed. Said differently, the form and characterization of the relationship may have changed,

but the substance did not. UMCI had fewer employees on its payroll and its formal relationship was with OHP rather than with Bugay individually. However, UMCI controlled or at the very least retained the right to control OHP's services to UMCI's employer clients and OHP's non-medical administrative services to the employees of those employer clients. The fact that UMCI personnel also referred to OHP as an independent contractor does not establish that as a legal conclusion.

Regardless of the label OHP attaches to its relationship with UMCI and with the limited facts presented, the Court finds that the relationship was one of agent and principal. OHP acted as an agent of UMCI and provided services to certain clients of UMCI who sought occupational health care services from UMCI. Had UMCI wished to change the procedures for those services, it could have directed OHP to make those changes. This finding recognizes that the employer clients were clients of UMCI before and after the incorporation of OHP.

#### 2. The Duty Owed By an Agent To Its Principal.

■■■■ An agent owes a duty of loyalty to its principal. This is a fiduciary duty and is similar to that existing between employees and employers. *Connelly v. Balkwill,* 160 Ohio St. 430, 440, 116 N.E.2d 701 (1954). The relationship "implies trust, confidence." *Connelly,* 160 Ohio St. at 440, 116 N.E.2d 701. An agent has a duty not to use information obtained in the agency relationship for his personal profit. *Connelly,* 160 Ohio St. at 441, 116 N.E.2d 701. Such use is even more egregious when it conflicts with the interests of the principal and is without disclosure to the principal. As with the employee/employer relationship, the agent's duty of loyalty exists during the terms of the relationship. *See Fremont Oil Co. v. Marathon Oil Co.,* 26 O.O.2d 109, 192 N.E.2d 123, 126 (Sandusky Co. C.P.1963).

The facts in *Fremont* provided that court with a clear case of a breach of loyalty to an employer by an employee. Certain employees solicited customers of their present

employer, the plaintiff, for the benefit of the defendant, a competitor of the plaintiff. The solicitation occurred prior to the employees' resignation from employment by the plaintiff. None of the employees was under a restricted covenant not to compete. In that instance the court found the covenant issue to be irrelevant and found, instead, that the employees had violated a duty of loyalty they owed to the plaintiff by soliciting customers for their own benefit prior to resigning their employment with the plaintiff. The court specifically found that the events leading to the unfair competition occurred prior to the severance of employment. *Fremont Oil,* 192 N.E.2d at 128. The court concluded that injunctive relief was warranted under those circumstances. *Fremont Oil,* 192 N.E.2d at 129.

■ This Court finds that the circumstances surrounding OHP's termination of its relationship with UMCI involved improper use by Bugay and OHP of UMCI's proprietary information, i.e. certain information from UMCI's "green sheets," financial reports and fee schedules. OHP's use of that information was not for the benefit of its principal, UMCI, but rather was for OHP's benefit in securing a business relationship with MedOhio. Such information is not and was not intended to be used by OHP's new provider in providing services to former clients of UMCI, but was used by MedOhio to evaluate the desirability of contracting with OHP. Under these circumstances, Bugay's and OHP's use of that information while still acting as an agent for UMCI was disloyal. In essence, OHP acted to set up a relationship with MedOhio which was intended to divert up to 37% of UMCI's gross billings. That action involved sharing UMCI's proprietary information with a competitor in a manner unknown and undisclosed to UMCI. OHP did this without informing UMCI of its intentions and hoped to get a competitive edge in taking these employer clients to its new provider, MedOhio, by "pulling the rug out" from under UMCI with a short termination notice, combined with an immediate correspondence with UMCI's employer clients which at least strongly implied that their occupational health service option was now only MedOhio. All these acts, except the correspondence to UMCI's clients, occurred while OHP, as an agent, owed a duty of loyalty to UMCI, its principal.

Further, the letter sent by OHP to UMCI's customers was confusing and ambiguous about UMCI's future role. (Plaintiff's Ex. 22) That letter failed to even mention the continuing existence of UMCI. The first paragraph reads "the purpose of this letter is to inform you that Occupational Health Plan (OHP) has moved to a new address and *changed our ambulatory care providers.*" (Emphasis added.) That paragraph insinuates that OHP had the authority and the ability to change the health care provider for UMCI's employer clients. The evidence simply does not support such a proposition. The employer clients were UMCI's and OHP merely served as a managerial and servicing agent for UMCI. The Court believes that the letter, although arguably legally correct, was intended to create a false impression in the employer clients.

OHP, through Bugay, breached the duty of loyalty it had to UMCI. Even though OHP, after termination, had a right to compete with UMCI, the events leading to that termination gave OHP an unfair competitive edge. OHP, while in an agency relationship with UMCI, used proprietary information belonging to UMCI for its personal benefit and in conflict with UMCI's interests. The letter, admittedly sent after OHP terminated its relationship with UMCI, was easily capable of misconstruction by UMCI's clients. Competition, though encouraged, must be fair and in line with commercial ethics. The series of actions engaged in by OHP before and shortly after its termination of business with UMCI does not meet this standard.

**C. *The Appropriateness of a Preliminary Injunction.***

■ The Court must now balance the factors set forth in *DeLorean* to determine whether a preliminary injunction should issue against the Defendants. *DeLorean,* 755 F.2d at 1228. The Court finds that under the circumstances of this case, UMCI

is likely to succeed on the merits of a claim against OHP and Bugay involving the actions taken by Bugay and OHP while acting as an agent for UMCI. The Court finds that OHP, as a managerial and servicing agent for UMCI, breached its duty of loyalty to UMCI by securing a position with a competitor, MedOhio, through the use of UMCI's proprietary information which OHP obtained through its relationship with UMCI.

The Court further finds that a narrowly drawn injunction may prevent irreparable harm to UMCI and, more importantly, to the creditors of UMCI's bankruptcy estate. The evidence indicated that UMCI could lose potentially 37% of its gross billing if its occupational health care business goes to competitor MedOhio. This potential loss is directly related to OHP's disloyal actions taken while in an agency capacity. The injunction which this Court intends to issue will cause little, if any, harm to others. This opinion should not be construed as a restriction on the ability of MedOhio or OHP to compete fairly and ethically with UMCI at the conclusion of the injunctive period.

Finally, the Court finds that the public interest will best be served by the issuance of a narrowly tailored injunction. The public interest served in this case is that of commercial ethics and the integrity of fair competition. Although it is important to encourage competition so that the best services will be provided at the most reasonable costs to the user, that competition must be fair. OHP's pattern of conduct in establishing a relationship with MedOhio, a direct competitor of UMCI, cannot be sanctioned by this Court. It is not the relationship itself, but the means used by OHP to secure it, which the Court finds offensive. Accordingly, the Court finds that a balancing of the factors stated in *DeLorean* leads to the conclusion that a narrowly tailored preliminary injunction should issue.

### VI. *Conclusion and Injunction*

The Court finds and hereby ORDERS the following preliminary injunction:

OHP, Dale Bugay and/or MedOhio:

1. Shall not take or use UMCI's "green cards" or information thereon which is specific to a particular employer client of UMCI's;

2. Shall not use, take or adopt UMCI's fee schedules or codes or fees set out in its rate books; and,

3. Shall not disclose the confidential financial information of UMCI to third parties.

IT IS FURTHER ORDERED that:

For a period of sixty (60) days, OHP, Dale Bugay and/or MedOhio:

4. Shall not directly solicit UMCI's occupational health care employer clients as those clients existed on the date OHP terminated its relationship with UMCI. During that sixty (60) day period, UMCI may advise its employer clients of the status of its occupational health services and may retrain its employees to perform the functions formerly performed by OHP. These employer clients include any which came to the "open-house" held by MedOhio, but do not include former employer clients of UMCI who were pre-existing clients also of MedOhio. Any correspondence which UMCI sends to its employer clients regarding this dispute or its current occupational health services must be accurate and must be copied to counsel for OHP and MedOhio and to the Bankruptcy Court's file of this adversary proceeding.

IT IS FURTHER ORDERED THAT:

Counsel for the plaintiff, UMCI, shall formally request the Court and parties before any further hearing for final relief will be scheduled.

IT IS SO ORDERED.