DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Defendant-appellants Sean E. Condren and Seacon Corporation ("Seacon") appeal the judgment of the Summit County Court of Common Pleas granting a five-year permanent injunction against the Appellants' distribution of a particular chemical. We affirm in part and reverse in part.
Condren began working for Sovereign Chemical Company ("Sovereign") in 1991. At first Condren served primarily as a liaison between Sovereign and a French company, Manufacture Landaise de Produits Chimiques. After a few months, Condren was given a sales territory. Among Condren's sales duties was selling terpene hindered phenols as antioxidants to the rubber industry. On May 15, 1992, Condren entered into an employment contract with Sovereign. This contract contained a covenant to retain confidences and covenant not to compete. Condren also entered several confidentiality agreements with respect to information he obtained from sales meetings.
In September 1995, Condren's employment was terminated by Sovereign and shortly thereafter, Condren started his own company, Seacon. Seacon marketed and sold a product, which we will call Chemical Z, which is identical to a Sovereign product we will call Chemical X. The chemical is marketed and used as an antioxidant in the rubber industry. Without an antioxidant in the rubber polymer, oxygen will eventually degrade the rubber. The market for better and different antioxidants for use in the rubber industry is apparently fairly competitive, and the best antioxidant for a given product may depend upon the product. There is heat buildup in tires, for example, which accelerates the oxidation and degradation processes, and an antioxidant in a rubber polymer used to make tires must be capable of counteracting those processes.
On October 4, 1996 Sovereign filed a complaint in the Summit County Court of Common Pleas against the Appellants. The complaint alleged that Condren breached agreements with Sovereign concerning confidential proprietary information that Condren had acquired during the course of his employment with Sovereign. This information primarily involved Chemical X. On October 4, 1996, Sovereign moved the trial court for a temporary restraining order against the Appellants. This motion was granted by the trial court on the same day. The order forbade the Appellants from supplying specific products to customers, from approaching Sovereign's customers in order to sell those products, and from using confidential information obtained by Condren during his employment with Sovereign. On October 8, 1996, the Appellants moved to dissolve the temporary restraining order. The trial court denied this motion.
On October 11, 1996, Sovereign moved the trial court to seal the records in the case in order to preserve the secrecy of the alleged trade secrets involved. The trial court ordered certain documents to be sealed. On October 17, 1996, Sovereign filed an amended complaint, which the Appellants answered.
A hearing was held on the matter of a preliminary injunction. Upon motion of the Appellants, the preliminary and permanent injunction phases of the action were combined. The trial court permanently enjoined[1] the Appellants from:
 1. Engaging in any contact with any customer or client that had a relationship with [Sovereign] regarding [Chemical X] prior to September 8, 1995;
 2. Using, receiving and/or disclosing [Sovereign's] confidential information or trade secrets relating to [Chemical X] including but not limited to the ingredients, formulas, applications, use and/or suppliers for [Chemical X]; and customer lists, pricing data and other proprietary information relating to [Chemical X]; and
 3. Selling, offering to sell, marketing, formulating or producing any product for the rubber industry which is blended, compounded with, mixed or incorporates ingredients from the same hindered phenol family as [Chemical X]. Specifically, and without limitation [the Appellants] are hereby prohibited from further selling, offering to sell, marketing, formulating or producing [the Appellants'] product currently known as [Chemical Z].
The Appellants moved the trial court to vacate its judgment pursuant to Civ.R. 60(B) on the basis of newly discovered evidence. A hearing was held and the trial court denied the motion. The Appellants appeal from the granting of the injunction, assigning six errors, the sequence of which we rearrange for ease of discussion.
 I. Injunctive Relief
R.C. 1333.61 to R.C. 1333.69 contains Ohio's Uniform Trade Secrets Act, which became effective July 20, 1994. R.C.1333.62(A) provides that actual or threatened misappropriation of a trade secret may be enjoined. "Misappropriation" includes the "use of a trade secret of another without the express or implied consent of the other person" who used improper means to acquire knowledge of the trade secret or knew that the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy." R.C. 1333.61(B). "Improper means" includes theft and misrepresentation. R.C. 1333.61(A). Thus, the right to an injunction[2] in trade secret cases is statutory, and hinges on whether the information at issue constitutes a "trade secret."
A reviewing court will reverse the granting of an injunction only where there has been a clear abuse of discretion. DanisClarkco Landfill Co. v. Clarke Cty. Solid Waste Mgmt. Dist.
(1995), 73 Ohio St.3d 590, paragraph three of the syllabus. Abuse of discretion connotes more than an error of law or judgment, but implies that the court's decision is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219.
 II. Ohio's Uniform Trade Secret Act
R.C. 1331.61 (D) defines trade secret and provides:
 "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
 (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.
 (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
(Emphasis added.)
A trial court's determination that certain information constitutes a "trade secret" will be upheld if supported by some competent, credible evidence. State ex rel. Fisher v. PRC Pub.Sector, Inc. (1994), 99 Ohio App.3d 387, 393.[3]
 A. Customer Lists and Pricing Data
The Appellants' second assignment of error states:
 THE TRIAL COURT HAD NO BASIS TO ENJOIN SEACON REGARDING ANY "CUSTOMER LISTS" OR "PRICING DATA" FOR [Chemical X], OR TO BAR SEACON FROM CONTACTS WITH SOVEREIGN CUSTOMERS, BECAUSE SOVEREIGN OFFERED NO EVIDENCE WHATSOEVER THAT SUCH INFORMATION WAS SECRET OR THAT SEACON EVEN MADE USE OF IT.
The definition of "trade secret" set forth in R.C. 1333.61(D) explicitly includes lists of names, addresses and phone numbers which "derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from [their] disclosure or use" and that are "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy."
There are, therefore, three criteria that must be met before the Appellants can be said to have "misappropriated" Sovereign's customer lists, in violation of Ohio's Uniform Trade Secret Act:
 (1) Sovereign's customer lists must derive independent economic value from not being generally known to or readily ascertainable by proper means by the Appellants;
 (2) Sovereign must have used reasonable efforts to maintain the secrecy of such lists; and
(3) Appellants must have used such customer lists.
See R.C. 1333.61(B). See, also Sonkin Melena Co., L.P.A. v.Zaransky (1992), 83 Ohio App.3d 169, 181-182. However, R.C.1333.62(A) provides that actual or threatened misappropriation of a trade secret may be enjoined. Therefore, the issuance of an injunction does not hinge on Sovereign's proving that the Appellant's "used' the customer lists, as threatened misappropriation of a trade secret is sufficient to allow the trial court to enjoin future use.
Samuel DiPaola, president of Sovereign, testified at the October 22, 1996 proceedings. DiPaola testified that he considered its customer lists to be proprietary information. DiPaola stated:
 I like to make a distinction between customers. The customer by itself is nothing more than a listing in a phone book and it doesn't become important until you attach some other information to it and that generally being the products that they buy from you and the prices they pay for it, the quantities they use and so forth.
DiPaola further testified that Condren had access to the customer lists, including information as to what each customer purchased from Sovereign. DiPaola testified that Condren had in fact printed out proprietary customer information in the form of a "sales analysis report," or SAR, and that such information was not required for the scope of the job Condren was performing at that time.
DiPaola testified that to gain access to customer information, Condren had to use a computer password known only to Condren and DiPaola.
DiPaola testified that the customer lists "detail literally every product that every customer for Sovereign Chemical buys, 151 page report" and that such report would be very damaging to Sovereign in the hands of a competitor. Because it is a small company, DiPaola stated that Sovereign's trade secrets, including the customer lists, were essential to maintaining some marketing advantage over the bigger companies and "account for [Sovereign's] ability to make a profit and grow." DiPaola also stated that Sovereign had confidentiality agreements with key employees with respect to the sales meetings and business and marketing plans.
We find that the trial court's determination that the customer lists and pricing data at issue in this case constitute trade secrets was based on competent, credible evidence. The record supports a conclusion that the lists were valuable to Sovereign, and that Sovereign took reasonable precautions, in the form of confidentiality agreements, warnings, and computer passwords, to protect the secrecy of such lists.
In addition, there was evidence presented which supports a determination that such lists were used by Condren. Condren testified that his company Seacon sold Chemical Z to Rubbermaid, Inc., and Alliance Rubber, that both Rubbermaid and Alliance are or were customers of Sovereign, and that he was aware by virtue of his employment with Sovereign that Rubbermaid had use for terpene hindered phenols. This evidence is sufficient to establish that Condren actually used Sovereign's customer lists, which included products and pricing data. In any event, the threat of their use by the Appellants is apparent from the evidence. The Appellants were in direct competition with Sovereign and in possession of valuable customer and product information. The possible use of such information constitutes a threat sufficient to support an injunction against their use by the Appellants.
The Appellants' second assignment of error is overruled.
 B. Chemical X
The Appellants' first assignment of error states:
 THE TRIAL COURT HAD NO BASIS TO ENJOIN SEACON REGARDING ANY "INGREDIENTS" OR "FORMULAS" FOR [Chemical X], BECAUSE SOVEREIGN MERELY REPACKAGES [Chemical X] AND DOES NOT EVEN KNOW ITS "INGREDIENTS" OR "FORMULAS."
Appellants' third assignment of error states:
 THE TRIAL COURT HAD NO BASIS TO CONTINUE TO ENJOIN SEACON REGARDING ANY "APPLICATIONS, USE AND/OR SUPPLIERS" OF [Chemical X], BECAUSE SOVEREIGN OFFERED NO CLEAR AND CONVINCING EVIDENCE THAT SUCH INFORMATION WAS ITS TRADE SECRET.
John Barry, Sovereign's founder, testified that Chemical X's use as an antioxidant in the rubber industry was indeed a unique application. Barry stated that he had tested between fifty and one hundred hindered phenols, from suppliers who were selling to the rubber industry and from suppliers who were not involved in the sale of hindered phenols to the rubber industry. Barry testified that by this method, he "discovered" Chemical X's unique application. Barry testified that Chemical X was used primarily in the "printing ink" and adhesive industries as a tackifier and adhesive, and that he was "pleasantly surprised" to discover that Chemical X worked well as a nonstaining antioxidant in rubber polymers. Barry further testified that information concerning this use of Chemical X was proprietary, and that such information was withheld even from Sovereign's supplier of Chemical X.
The evidence at the hearing showed that Condren acquired knowledge of Sovereign's unique application of Chemical X while employed by Sovereign and that Condren knew of Chemical X's secret or proprietary status. Condren testified at trial that he has a Bachelor of Arts degree in history and French literature and has no formal education in chemistry. Condren testified that he acquired some knowledge of the transportation and storage of chemicals while working as a "traffic manager" for Prochimie, a rubber chemical company, but had no experience in the design, development or application of chemical products. Specifically, Condren testified that while Prochimie was involved in the sale of antioxidants to the rubber industry, it was not involved in the sale of terpene hindered phenols and that prior to his employment with Sovereign, he had no knowledge of terpene hindered phenols or their application as an antioxidant in the rubber industry. Condren testified that he first learned of terpene hindered phenols and their use as antioxidants in the rubber industry while employed at Sovereign. Condren stated that he knew of only three companies that market terpene hindered phenols for use as antioxidants to the rubber industry, and that his company, Seacon, was one of those companies. Condren testified that Seacon's product, Chemical Z, was identical to Sovereign's product Chemical X and Sovereign's supplier's product, Chemical Y. Condren testified that he learned that Chemicals X and Y were identical while working for Sovereign, and that Sovereign's marketing of Chemical X as an antioxidant in the rubber industry was different than its supplier's marketing of Chemical Y for use in the adhesive industry.
The specific information that Sovereign sought to keep secret was that Chemical X was really Chemical Y, a product purchased from a chemical supplier and merely repackaged and relabeled as Chemical X. The evidence at trial established that Sovereign's "secret" use of a particular terpene hindered phenol as an antioxidant was economically valuable to Sovereign. The evidence showed that such information, if it became public, could be detrimental to Sovereign's business and that Sovereign made efforts to keep such information secret. DiPaola testified that Sovereign made a "conscious effort * * * to let everyone in the company know that [it is] a small company but [it does] have some novel ideas" and that Sovereign has never divulged to any customer or competitor the ingredients of Chemical X. Condren himself testified that Sovereign indicated in its literature on Chemical X that its chemical composition was proprietary because it wanted to keep the chemical composition of Chemical X a "secret."
We conclude that Sovereign took reasonable measures to ensure the secrecy of Chemical X. R.C. 1333.61 does not require that every possible precaution be taken, or that the company's steps be foolproof. The statute requires reasonable action under the circumstances. Sovereign's confidentiality agreements with key employees, its refusal to release or give information to competitors, suppliers and customers regarding Chemical X, and its repeated admonitions and warnings to those employees regarding the secrecy of Sovereign's repackaging of Supplier's Chemical Y as Chemical X and marketing it as an antioxidant to the rubber industry were reasonable under the circumstances. Therefore, both the application of Chemical X and the identity of Sovereign's supplier of Chemical Y are entitled to trade secret status.
Appellants assert that a third party had already discovered the information regarding Chemical X's original identity as Chemical Y and its use as an antioxidant in the rubber industry. Therefore, appellant's argue, Sovereign's marketing of Chemical X for a unique application is not a trade secret. This argument is without merit. Under Ohio's Uniform Trade Secret Act, two companies that have independently "discovered" the same valuable information are entitled to the Act's protection, and as long as the requirements of R.C. 1333.61(D) are met by both companies. The fact that a third company has acquired the same information does not render the information "readily ascertainable by proper means" and does not defeat its status as a trade secret, the actual or threatened use of which may be enjoined.
The Appellants' first and third assignments of error are overruled.
 C. Terpene Hindered Phenols
The Appellants' fifth assignment of error states:
 THE TRIAL COURT HAD NO BASIS TO BAR SEACON FROM USE OF THE ENTIRE CLASS OF TERPENE HINDERED PHENOLS, BECAUSE SOVEREIGN OFFERED NO CLEAR AND CONVINCING EVIDENCE THAT SUCH BROAD INFORMATION WAS ITS TRADE SECRET.
"Trade secrets" include any technical information that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use. R.C. 1333.61(D). The question, therefore, is: when information concerning one specific application or use of one type of terpene hindered phenol is determined to be a trade secret, can the court enjoin the defendant from selling all types of terpene hindered phenols to the rubber industry? We hold that it cannot. The evidence indicated that "terpene hindered phenols" are a subclassification or subgroup of the group of compounds known as "hindered phenols." There is no evidence in the record to support the trial court's classification as Sovereign's trade secret the use of all terpene hindered phenols as antioxidants in the rubber industry. In fact, Dr. William Brittain, one of the Appellants' expert witnesses, testified at the hearing on the Appellant's motion to vacate that there are approximately fifty terpenes. In addition, there was sufficient evidence to show that the use of hindered phenols as antioxidants in rubber polymers is fairly well known. Sovereign's trade secret is the specific use of Chemical X, one type of terpene hindered phenol, as an antioxidant in rubber polymers. This trade secret does not encompass all other terpene hindered phenols. The injunction is therefore overbroad and should be limited in scope to Chemical X.
Appellants' fifth assignment of error is sustained.
 D. Newly Discovered Evidence
Appellants' fourth assignment of error states:
 THE TRIAL COURT HAD NO BASIS TO CONTINUE TO ENJOIN SEACON REGARDING ANY "APPLICATIONS, USE AND/OR SUPPLIERS" OF [Chemical X] AFTER SEACON DEMONSTRATED THAT IT HAD INDEPENDENTLY ASCERTAINED SUCH INFORMATION.
We initially note that a motion for relief from the judgment pursuant to Civ.R. 60(B) was probably not the correct vehicle by which to raise the argument that a trade secret no longer exists. R.C. 1333.62(A) provides that "[u]pon application to the court, an injunction shall be terminated when the trade secret has ceased to exist[.]"
In their Civ.R. 60(B) motion, the Appellants argued that they had "newly discovered evidence" regarding the "readily ascertainable" composition and identity of Chemical X and its supplier. The trial court held a hearing on the matter and then denied the motion to vacate the injunction. Civ.R. 60(B) provides in part:
 On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: * * * (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(B)[.]
Civ.R. 59(B) provides that a motion for a new trial shall be served within fourteen days after the entry of the judgment. We review a trial court's decision on a motion for relief from judgment under an abuse of discretion standard. Quebodeaux v.Quebodeaux (1995), 102 Ohio App.3d 502, 504. An "abuse of discretion" is more than an error of law or judgment; it connotes a judgment that is unreasonable, unconscionable or arbitrary.Id., at 505.
Judgment was entered by the trial court on December 2, 1996. On December 30, 1996, the Appellants filed their motion to vacate the permanent injunction order pursuant to Civ.R. 60(B). On December 31, the Appellants filed their notice of appeal. The Supreme Court of Ohio has held that the filing of a notice of appeal operates to divest the trial court of jurisdiction to hear a party's motion for relief from judgment. Howard v. CatholicSocial Serv. of Cuyahoga Cty., Inc. (1994), 70 Ohio St.3d 141,147. Nevertheless, the trial court considered the Appellants' motion for relief from judgment. On March 11, 1997, a hearing was held on the matter. On March 25, 1997, the trial court denied the Appellant's motion, but amended its December 2, 1996 order, changing the injunction to a five-year injunction.
The Appellants assign as error the trial court's continuation of the injunction. Pursuant to Civ.R. 60(B), the vehicle by which the Appellants chose to bring this matter before the trial court, the Appellants must show that they could not have, with due diligence, discovered this "new" evidence within fourteen days after the entry of judgment. However,
 [An injunction] * * * should generally terminate when a former trade secret becomes either known to good faith competitors, or is obtained by them because of the lawful availability of products that can be reverse engineered to reveal such trade secrets.
Valco Cincinnati Inc. v. ND Machining Service, Inc. (1986),24 Ohio St.3d 41, 48.
The Appellants have not shown that their allegedly "new" evidence could not have been produced within the fourteen-day period to move for a new trial.[4] Even so, the trial court considered the merits of the Appellant's motion, stating in its memorandum in support of its order denying relief:
 The evidence presented on the motion to vacate is not new under the rule.
* * *
 The secret is not merely the knowledge of the compound's formula.
 The evidence presented on the motion to vacate was not new, was repetitive, cumulative, and was not dispositive of the issue of the injunction.
* * *
 [Sovereign] still has a secret which [Appellants] appropriated despite [Condren's] confidentiality agreements.
We agree with the trial court's analysis. We have reviewed the transcript of the hearing on the Appellant's motion for relief from judgment, as well as the briefs and exhibits in support of and in opposition to the motion. Appellants argue that they cannot be further enjoined from using the information regarding the supplier of Chemical X, its application as an antioxidant in the rubber industry and its chemical composition when they had independently ascertained this same information. We disagree. The standard is not whether the information is "ascertainable." The standard is whether such information is readily ascertainable by proper means. Condren cannot allege, in all seriousness, that he did not have a "head start" on independently ascertaining this information by virtue of the knowledge he acquired while in the employ of Sovereign. The record supports the trial court's determination that Sovereign's application of Chemical X is innovative, valuable, and, most importantly, secret, and that Sovereign is still entitled to a injunction prohibiting the Appellants from using information concerning the supplier of Chemical X, its unique application as an antioxidant in rubber polymers, and its formula.
The trial court did not abuse its discretion in denying the Appellants' motion for relief from judgment. The Appellant's fifth assignment of error is overruled.
The Appellants' sixth assignment of error states:
 THE TRIAL COURT HAD NO BASIS TO PREMISE AN INJUNCTION ON ANY SUPPOSED "AGREEMENT" BETWEEN CONDREN AND SOVEREIGN WHEN THE EVIDENCE IS UNDISPUTED THAT NO SUCH AGREEMENT EXISTS, AND NO SUCH AGREEMENT COULD CREATE TRADE SECRET PROTECTION WHERE NONE ALREADY EXISTED.
Because we have determined that Sovereign is entitled, pursuant to R.C. 1333.62(A), to the five-year injunction prohibiting the Appellants from using information concerning Chemical X's application as an antioxidant in the rubber industry, Sovereign's customer lists and pricing data, and Sovereign's supplier of Chemical X, the Appellants' sixth assignment of error is moot.
The judgment of the trial court is affirmed in part, reversed in part and the cause is remanded for proceedings consistent with this opinion.
Judgment affirmed in part reversed in part and causeremanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this court, directing the County of Summit Common Pleas Court to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to both parties equally.
 Exceptions. _______________________________ WILLIAM R. BAIRD
FOR THE COURT
QUILLIN, J., P. J.
DICKINSON, J.
CONCUR.
[1] The trial court later modified the order granting the injunction, limiting it to five-years' duration.
[2] The Appellants argue that each element must be proven by clear and convincing evidence before the trial court can order an injunction. This rule applies to preliminary injunctions. See Vanguard Transp. Sys., Inc. v. EdwardsTransfer Storage Co., Gen. Commodities Div. (1996), 109 Ohio App.3d 786,792-793. The injunction at issue is a permanent injunction, or an injunction that the trial court has orderedafter a hearing on the merits has been held. The fact that this injunction was later modified to a five-year injunction does not defeat its status as a permanent, as opposed to apreliminary, injunction. The permanent injunction in this case is authorized by R.C. 1333.62(A), which does not specify "clear and convincing" evidence as the standard which a plaintiff must meet. The clear language of Ohio's Uniform Trade Secret Act indicates that where the requirements of a trade secret are proven, and where actual or threatened misappropriation of the trade secret by the defendant is shown, the court may issue an injunction. R.C. 1333.61(B) and (D) and R.C. 1333.62(A).
[3] State ex rel. Fisher involved the potential disclosure of trade secrets by the state when releasing information regarding the winning bid on a state contract and the state's evaluation of the submitted bids. That case did not involve R.C. 1333.61 et seq., but rather R.C. 1333.51, which has since been repealed. However, the definition of "trade secret" under both statutes is identical. Therefore, we find that the standard of review set forth in State ex rel. Fisher applies to the case at bar.
[4] One of the Appellants' expert witnesses, Robert Seiple, manager of the EPIC Applied Polymer Research Center at the University of Akron, testified at the March 11, 1997 hearing that the High Performance Liquid Chromatography machine used to analyze a sample of Chemical X was acquired by the University of Akron several years prior to the hearing. In addition, Seiple testified that an "equivalency book" he used in his analysis was published "some years ago."