**HOFFMANN–LA ROCHE INC., Plaintiff,**

v.

**Frank W. YODER, M.D., Defendant.**

**Civil Action No. 2–96–204.**

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 7, 1997.

---

Terrance Michael Miller, Porter Wright Morris & Arthur, Columbus, OH, Karl E. Seib, Jr., Patterson Belknap Webb & Tyler, New York City, for Hoffmann–La Roche Inc.

James August Readey, Columbus, OH, for Frank W. Yoder, MD.

John Wolcott Zeiger, Zeiger & Carpenter, Columbus, OH, for Columbus Dispatch.

Claudia R. Eklund, Sindell, Lowe & Guidubaldi, Cleveland, OH, for Wanda Foglyano.

## OPINION & ORDER

DLOTT, District Judge.

This case presents novel questions concerning whether documents provided to a physician by a pharmaceutical company for use in connection with clinical drug trials are protected "trade secrets" under Ohio's Uni-

form Trade Secrets Act. The Plaintiff, Hoffmann–La Roche, Inc. (hereinafter "Roche") alleges that more than 550 pages of documents obtained by the Defendant in the late 1970s and early 1980s while he served as a clinical investigator for Roche constitute "trade secret" information of the company. The Defendant, Frank W. Yoder, M.D., argues that such information has been the subject of widespread publication within the medical field and thus is generally known and readily available. Dr. Yoder also argues that Roche, both at the time he received the documents and over the past fifteen years, has not made reasonable efforts to maintain the secrecy of the information provided, and thus has forfeited any claim to trade secret protection under Ohio law.

On March 20, 1996, the Court heard testimony on Plaintiff's motion for a preliminary injunction to enjoin the Defendant from selling the documents at issue. At that time the Court granted Defendant's motion to consolidate the hearing on the preliminary injunction with the ultimate trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2). The matter was continued until April 24, 1996, at which time all testimony concluded. On July 31, 1996, the Court ordered the Plaintiff to provide the Court with additional information regarding litigation in New Jersey involving Roche and the secrecy of similar documents, and to compile an index of the documents involved in this case. This matter is now ripe for final decision.

## I. FINDINGS OF FACT

Hoffmann–La Roche is a duly organized corporation existing under the laws of the State of Delaware with its principal place of business in New Jersey. Roche is involved in the business of, among other things, the manufacture, sale and distribution of various pharmaceutical and medical products. In the late 1970s Roche received permission from the Food and Drug Administration (hereinafter "FDA") to conduct clinical investigations on 13–Cis Retinoic Acid—the active ingredient in the drug currently known as "Accutane".[1] As part of its clinical trials, Roche

retained physicians from around the country to prescribe Accutane to their patients.

The Defendant, Dr. Yoder, served as one such clinical investigator for Roche from approximately 1977 to 1983. Prior to that—from 1975 to 1977—Dr. Yoder was involved with the study of Accutane while serving as a clinical associate at the National Institute of Health ("NIH") under the supervision of Dr. Gary Peck. Dr. Yoder left the NIH in 1977 and moved to Columbus, Ohio, where he opened his own private practice and became a Roche clinical investigator.

Roche compensated Dr. Yoder on a reimbursement basis, with approximately $1,500 allotted for each patient's treatment. These payments lessened over time and were ultimately eliminated once the drug was approved. All of Dr. Yoder's work for Roche was carried out at his offices. It is undisputed that at all times during the course of the Accutane trials Dr. Yoder's primary responsibility was to his patients.

From 1977 to 1981 Dr. Dorothy Windhorst served as Roche's Director of Clinical Research for retinoids. As such, Dr. Windhorst supervised Roche's clinical trials relating to Accutane and was responsible for selecting, retaining, meeting and instructing the Accutane clinical investigators. As part of the clinical trials Roche provided its investigators with materials relating to Accutane, including protocols setting forth the standards and guidelines for conducting the trials and investigational drug brochures (hereinafter "IDB" or "IDBs") outlining the results of animal and clinical studies conducted by Roche.

On January 12, 1996, Dr. Yoder sent a letter to Roche enclosing a photocopy of an advertisement indicating that he intended to sell his collection of documents relating to Accutane, including an unpublished manuscript written by him entitled, "Accutane Induced Birth Defects—A Preventable Tragedy." The advertisement, published in *The Columbus Daily Reporter* on January 4, 1996, stated in relevant part:

1. Accutane is Roche's trade name for the drug, which also is known as "13–Cis Retinoic Acid"

and "Isotretinoin." For the sake of simplicity, this Order will refer to the drug as "Accutane".

## UNIQUE SEALED–BID AUCTION

The entire private collection of Frank W. Yoder M.D. regarding the development, use and misuse of ISOTRETINOIN (Accutane) will be sold by a sealed-bid auction. This sale includes documents relating to the original protocol, letters from European investigators, and a never before distributed or published manuscript titled, "Isotretinoin Birth Defects—A Preventable Tragedy."

Individuals, corporations and all other serious parties are invited to participate in this unique and one time event. The minimum bid is $9.5 million dollars (U.S. Currency) and 20% of the net proceeds will be designated for the prevention of birth defects.

Pl.'s Ex. 1. A similar advertisement appeared in *The Washington Post* on February 11, 1996. Dr. Yoder testified that the roughly 550 pages of documents at issue are important because they comprise about 20% of the footnotes and references for his manuscript. Transcript, April 24, 1996, (hereinafter "Tr. 2") at 182–83. He stated that although he believes most of the information at issue is published elsewhere in medical literature, the information "becomes important because of what was omitted from the black book, from the IDBs, and if I don't have that, it destroys, it weakens the manuscript that I wrote." Tr. 2 at 183. Finally, Dr. Yoder testified that the documents at issue are only a portion of his life's work in collecting documents relating to the development of Accutane. Tr. 2 at 158.

On February 27, 1996, Roche filed suit against Dr. Yoder, seeking an injunction to prevent Dr. Yoder from selling or disseminating "any highly proprietary, confidential and trade secret information Dr. Yoder received from Roche while he was a clinical investigator for Roche regarding Accutane" and seeking replevin of such documents. Compl. at ¶ 38. By letter dated March 1, 1996, the parties agreed to hold the contested documents in status quo pending the Court's determination of whether these documents constitute protected trade secrets under Ohio law. J. Entry, March 19, 1996 (Docket No. 17).

The documents at issue in this case can be grouped into three broad categories: (1) protocols for clinical trials or materials related directly thereto, (2) investigational drug brochures, and (3) correspondence between Roche and Dr. Yoder from 1977 to 1983.[2]

Roche lists as "Protocol Materials" Document Nos. 4 and 172–175.[3] A careful review of these documents, however, reveals that they are overlapping versions of the same two protocols, Protocol 970 (Doc. No. 172) and Protocol 2109A (Doc. No. 175).[4]

The first two hundred pages of contested documents consist of three separate investigational drug brochures, Document Nos. 1–3, dated 1975, 1978 and 1982. Once again, there are substantial areas of overlap between these documents. In general, the IDBs contains information regarding: (1) the chemical composition of Accutane,[5] (2) reported animal pharmacological and toxicological studies of the drug, (3) human clinical studies, and (4) recommendations for clinical use. Each document builds upon the other and summarizes the findings of Roche's pro-

---

2. Over the course of this litigation Roche has withdrawn a number of the documents originally submitted. Plaintiff's counsel termed these "stupid" documents that never should have been included. Transcript, March 20, 1996, (hereinafter "Tr. 1") at 23. The Court notes that there remains within the category marked "correspondence" documents that ostensibly still fall within the "stupid" category, or that are exact duplicates of one another.

3. All documents cited in this Order will be referenced according to the record number assigned to them in column one of the document entitled "Plaintiff Hoffmann–La Roche Inc.'s Index of Trade Secret Documents Submitted to this Court

as Required by ¶ 3 of this Court's July 31, 1996 Order" (hereinafter "Roche Index") (Docket No. 49). When referring to a particular page of a document, the Court will also set forth its Roche "Bates" number, found in columns two and three of the Roche Index.

4. This conclusion is based on the Court's analysis as well as Plaintiff counsel's own admission: "There are two protocols in the 550 pages. Protocol 970 and Protocol 2109A." Tr. 2 at 21.

5. There is no issue in this case, however, that the chemical formula for Accutane is at risk of being exposed. Such information is already publicly available.

gressive research on Accutane. Thus Document No. 3, dated 1982, provides more extensive and detailed information in each of these areas than the first IDB, Document No. 1, prepared in 1975.

Document Nos. 5 through 171 contain various pieces of correspondence between Dr. Yoder and Roche from 1977 to 1983. The total number of pages of correspondence is roughly 330. Of the 166 pieces of correspondence, approximately one-third of the letters were written by Dr. Yoder and addressed to various individuals at Roche.[6] Many of the letters address everyday housekeeping matters such as reimbursement expenses, notifications of drug supplies and company leave. Some of the documents, however, contain substantive information regarding patient side-effects, animal research studies, and amendments to the protocols.

Based upon the full record, including all the testimony and the submissions of the parties, the Court makes the following findings of fact relevant to the determination of trade secret status under Ohio law.[7]

## A. Economic Value of the Documents to Competitors and Others

The undisputed record reveals that Dr. Yoder offered the documents for sale at a minimum bid of $9.5 million.

Roche also presented evidence that the area of retinoid research remains competitive in the pharmaceutical industry. Roche is currently conducting clinical trials and investigations of its retinoids for use in the treatment of other diseases. The FDA recently approved for market Roche's retinoid, Vesinoid, to treat leukemia. Johnson & Johnson—a major competitor of Roche in the field of retinoids—is currently conducting clinical investigations of a retinoid called Fenretinide for the treatment of ovarian, breast and prostrate cancers.

Based on the above, the Court is persuaded that the contested documents possess at least some economic value.[8]

## B. Public Availability of the Information Sought

During the course of this litigation it was brought to the Court's attention that Roche is also involved in a dispute in New Jersey state courts, *Hammock v. Hoffmann–La-Roche*, 142 N.J. 356, 662 A.2d 546 (1995), involving the disclosure of numerous documents related to Accutane. Accordingly, the Court ordered Roche to provide the Court with a summary of that litigation and a memorandum detailing those documents—if any—that are at issue in both cases. Order July 31, 1996 (Docket No. 44).

In response, Roche filed a memorandum and attached Judge Gallipoli's August 2, 1996, Order on Remand. There are three documents at issue in both cases: Roche's 1978 IDB (Doc. No. 2); Roche's Protocol 2109A (Doc. No. 175); and a letter dated April 3, 1979, to Dr. Yoder from Dr. Windhorst (Doc. No. 53). Of these, Judge Gallipoli ordered the 1978 IDB and the letter declassified. Judge Gallipoli also ordered the protocol declassified, "as redacted." Roche's memorandum, however, represents that Protocol 2109A is to remain confidential, with the exception of one paragraph. Pl.'s Mem. at 1 (Docket No. 48). The Court was unable to verify Roche's representation through its own research.[9] On October 21,

---

**6.** Plaintiff's counsel conceded at trial that if the documents authored by Roche were returned, Roche would probably relinquish its claim to the correspondence generated by Dr. Yoder. Tr. 2 at 253–54.

**7.** Any finding of fact that is more properly construed as a conclusion of law shall be so construed. Likewise, any conclusion of law that is more properly construed as a finding of fact shall be so construed.

**8.** The Court doubts whether the various pieces of correspondence—either individually or collectively—have any real value to a potential competitor. Nevertheless, the Court views the fact that Dr. Yoder is attempting to sell these documents, in total, for a rather large sum of money as some indication that they possess at least minimal value.

**9.** This Court contacted Judge Gallipoli to determine what portion of the protocol remained confidential. His office informed the Court that they no longer have a copy of the documents because they were reviewed *in camera* and directed the Court to Roche's New Jersey counsel, who was of no assistance.

1996, Judge Gallipoli denied Roche's Motion for Reconsideration. The Court thus finds that—as a result of the *Hammock* litigation—the 1978 IDB (Doc. No. 2), at least a portion of Protocol 2109A (Doc. No. 175), and the letter from Dr. Windhorst (Doc. No. 53) are to be released into the public domain.[10]

Defense counsel also submitted into evidence two protocols obtained from the National Institute of Health [11] (hereinafter "NIH") through a Freedom of Information (hereinafter "FOIA") Request, Protocol 76–C–64 and Protocol 79–C–36. Def.'s Ex. 15.[12] The cover letter to these materials indicates that defense counsel also requested the accompanying investigational drug brochures, but that "[t]he National Cancer Institute (NCI) no longer has Investigational Drug Brochures for 1972 and 1975 for 'R04–3780, 13–Cis Retinoic Acid.'" Def.'s Ex. 15. The Court has carefully reviewed the NCI protocols and compared them, line by line, with Roche Protocol 970 and Protocol 2109A. The Court finds that NCI Protocol 76–C–64 is similar to Roche Protocol 970.[13] Moreover, the Court finds that NCI Protocol 79–C–36 is virtually identical to Roche Protocol 2109A.[14]

Finally, the Defendant offered testimony and exhibits in support of his contention that the information contained in the contested documents has been made public over the past fifteen years. Dr. Yoder testified that the information contained in Protocol 970 was described in detail in the compendium of articles that accompanied the 1981 Iowa Workshop on Oral Retinoids. These articles, published as a supplement to the April, 1982 edition of the American Academy of Derma-

tology, number more than 800 pages and were admitted as Defendant's Exhibit 7. Specifically, Dr. Yoder pointed to Dr. Windhorst's article entitled, "The Use of Isotretinoin in Disorders of Keratinization" as containing "the important information on how this study was done, how much was given, how long it was given, and so forth." Tr. 2 at 133; Def.'s Ex. 7 at 708. Dr. Yoder thus concluded that based on this information any medical researcher could obtain an understanding of Protocol 970. *Id.*

The Court has carefully reviewed Protocol 970 as well as the aforementioned article and other articles submitted as part of Defendant's Exhibit 7. Although the Court is not a physician, it appears from the Court's review that virtually all of the information contained in Protocol 970 is incorporated into these materials. To the extent the entire document has not been reproduced, the Court is convinced that a medical professional in the field could, with a little effort, deduce the missing details. Accordingly, the Court credits Dr. Yoder's testimony that the information contained in Protocol 970 has been published in the public domain.

With regard to the IDBs, Dr. Yoder testified that "95 to 99 percent" of the information contained in these documents was later incorporated into the *1983 Physicians Desk Reference* (Def.'s Ex. 20) or in the Iowa Workshop materials (Def.'s Ex. 7). Tr. 2 at 173–175. He stated this is so because the FDA requires much of the information from the IDB to be published in order for physicians to be fairly appraised of how to use the

---

**10.** The Court recognizes that Roche can and indeed probably will appeal Judge Gallipoli's decision. In this regard the Court notes that this matter has already been before the New Jersey Supreme Court, and the Court has reviewed that Court's decision. *See Hammock v. Hoffmann–LaRoche, Inc*, 142 N.J. 356, 662 A.2d 546 (1995).

**11.** On their face the documents reflect they are from the National Cancer Institute, which at the time was part of the National Institute of Health. Tr. 2 at 105.

**12.** Plaintiff's Motion to Exclude Defendant's Exhibit 15 (Docket No. 31) is **DENIED.**

**13.** Roche Protocol 970 is an expanded and more detailed version of the NIH Protocol 79–C–64. Both Protocols state similar objectives, similar

procedures for selection and clinical evaluation of patients, similar contraindications, similar sections on stratification and randomization, and identical bibliographies.

**14.** Roche Protocol 2109A is a slightly expanded and more detailed version of NIH Protocol 79–·C–36. As Dr. Yoder testified, the primary difference between the two is that the NIH protocol did not require a pregnancy test whereas the Roche protocol did. Tr. 2 at 169. The other differences relate primarily to the number of patients evaluated, safety measurements, requirements for clinical evaluation, and minor changes relating to the monitoring of patients.

drug. Tr. 2 at 177–78. Dr. Yoder specifically pointed to articles written by Dr. Jerome Kamm and other Roche investigators and published in the Iowa Workshop materials as being "almost identical" to the information contained in the IDBs. Tr. 2 at 178; Def.'s Ex. 7 at 652. Once again, although the Court is not a physician, it has undertaken a copious review of Defendant's Exhibit 7 and the IDBs submitted. Based on this review, the Court agrees that most—although not all—of the information contained in the three IDBs is also found elsewhere in the Iowa Workshop materials and/or the *1983 Physicians Desk Reference*.

## C. Roche's Efforts to Maintain Secrecy

The parties presented differing accounts of Dr. Yoder's knowledge and understanding regarding the confidentiality of the documents at issue. Roche produced no evidence of a written confidentiality agreement between the company and Dr. Yoder nor any of the other clinical investigators involved in the Accutane trials.[15] As to the existence of an oral agreement, Dr. Windhorst testified that it was her general practice at the time to explain to clinical investigators "what trade secrets were and what the relationship of the drug company to the FDA was" and discuss confidentiality with new clinical investigators. Tr. 1 at 50–51. Dr. Windhorst testified, however, that she had no recollection of a specific conversation with Dr. Yoder regarding confidentiality.[16] This testimony directly contradicted Dr. Windhorst's sworn affidavit, which she herself conceded was not written in her own words.[17]

Roche also submitted the depositions and affidavit of three other clinical researchers involved in the study of Accutane—Drs. Krueger, Pochi and Strauss—regarding their recollection of an oral confidentiality agreement. Dr. Krueger stated that when he first agreed to be a clinical investigator for Roche, Dr. Windhorst "reminded me that Roche protocols were considered confidential, as were any data that would come from said protocols." Pl.'s Ex. 12 (Krueger Dep.) at 7. Dr. Krueger's memory was that the conversation specifically addressed "protocols and data", not correspondence, although that too may have been mentioned. *Id.* Dr. Strauss' affidavit states that at the time he agreed to be a clinical investigator for Roche, Roche stressed to him that, "I would be receiving highly confidential, proprietary, and trade secret documents from Roche . . ." Pl.'s Ex. 6 (Strauss Aff.) at ¶ 3.

Dr. Pochi testified, however, that he could not "specifically recall a discussion of this type [regarding confidentiality], although I undoubtedly believe that Dr. Windhorst did." Pl.'s Ex. 11 (Pochi Dep.) at 9.

**15.** Roche represented to the Court through the testimony of Dr. Windhorst that at one point there was a written clinical researchers manual, which according to Dr. Windhorst, "didn't talk about Roche procedures, but it talked about what the person in clinical research at Roche was suppose[d] to do." Tr. 1 at 49. Such things included getting the investigator's signature on the FDA form 1572, getting their curriculum vitae sent to the FDA, and making sure the investigator understood the confidentiality of the documents. *Id.* Plaintiff's counsel represented that Roche had searched for the manual but "it does not exist at Roche now as far as we know." Tr. 1 at 50.

**16.** The following exchange took place between counsel for Roche and Dr. Windhorst:

Q: Now, at the time you retained Dr. Yoder as a clinical investigator, did you discuss confidentiality with him? Let me ask this first. Do you remember a specific conversation with Dr. Yoder about discussing confidentiality?

A: No.
Tr. 1 at 45.

**17.** Dr. Windhorst's affidavit reads:

At the time I decided to let Dr. Yoder be an investigator for Roche, I informed Dr. Yoder that in the course of his employment with Roche, he would be receiving and be exposed to highly proprietary and trade secret information of Roche related to Accutane—necessary for his participation in the study—and that he was required not to divulge or disseminate any of these materials to the public.

Windhorst Aff. at ¶ 4; Tr. 1 at 62–63. After reading this passage to Dr. Windhorst counsel for Roche asked if that was her testimony. Dr. Windhorst replied, "I wouldn't have used those words, but basically that, yes." Tr. at 63. Upon further questioning by the Court Dr. Windhorst explained that she was merely referring to the legal terminology, "I think I may have known the term 'confidential' but I am not sure I really understood or knew the term 'trade secret' at that time, is all I was saying." *Id.*

Dr. Yoder testified that, upon agreeing to serve as a clinical investigator, he was never told by Dr. Windhorst or any other Roche employee that any of the materials he would receive were confidential. Tr. 2 at 118. The first mention of confidentiality by Roche was in January of 1983, following his publication of an article in the *Journal of American Medical Association* detailing the possible side effects of Accutane. Tr. 2 at 141. Prior to that time Dr. Yoder had published at least two other articles relating to Accutane, and neither Dr. Windhorst nor any other employee of Roche cautioned him about revealing potentially confidential information. Tr. at 124–25, 128–29. It was Dr. Yoder's understanding that Roche in fact encouraged, rather than discouraged, dissemination of information relating to Accutane. Tr. 2 at 124.

Another former employee of Roche, Joyce Coutinho, testified that she served as a Clinical Research Associate for Roche during the Accutane clinical trials. She testified her standard practice was to go over with the clinicians the drug protocols, investigational drug brochures, and issues of confidentiality. Tr. 2 at 39. According to Ms. Coutinho, she first met Dr. Yoder at the NIH, probably some time in 1976. *Id.* He was working with Dr. Peck at the time and Dr. Peck was conducting the initial study on Accutane. Tr. 2 at 41. Ms. Coutinho testified that she specifically recalled discussing confidentiality with Drs. Peck and Yoder, although she conceded that Dr. Yoder was not present at all of the meetings she held with Dr. Peck. Tr. 2 at 41–42. When asked how many meetings she held with Drs. Peck and Yoder and over what period of time she replied, "Several meetings. I travelled to the NIH twice a month or once a month at least from 1976 until the early 80's." Tr. 2 at 41.

The record is clear that Dr. Yoder left the NIH in 1977 and began another clinical trial in Columbus, Ohio, under a different protocol, 970, which was not assigned to Ms. Coutinho. Tr. 2 at 117–18. Thus it was not possible for Ms. Coutinho to meet with Dr. Yoder at NIH after 1977. It is also not clear from her testimony that Dr. Yoder was pres-

ent at any of the conversations in 1976 and 1977 that involved the discussion of confidentiality. Finally, Dr. Yoder testified that, "I was never told by anyone, including Dr. Windhorst or Joyce Coutinho, that anything I was doing at the NIH was confidential." Tr. 2 at 106–07.

In sum, the Court finds that there is insufficient evidence of either a written or oral confidentiality agreement between Roche and Dr. Yoder. Dr. Windhorst's testimony is at least partially inconsistent and vague, and Ms. Coutinho said little to clarify the issue. Both individuals served as long time employees of Roche and offered general testimony regarding their practices, rather than any specific recollection of conversations with Dr. Yoder. Of the three other investigators who worked on Protocol 970, at least one, Dr. Pochi, had no recollection of a discussion about confidentiality. The Court does not find Dr. Strauss' affidavit credible because on its face it contradicts Dr. Windhorst's testimony. The affidavit states that he was told this information, was "highly confidential, proprietary, and trade secret." Dr. Windhorst—in trying to deflect her admission that the affidavit was not her own work—stated that "I think I may have known the term 'confidential' but I am not sure I really understood or knew the term 'trade secret' at that time ... I would have said this is confidential material." Tr. 1 at 63. If she did not know of that term, and if Roche relied solely on Dr. Windhorst's oral admonitions rather than written agreements to establish confidentiality, Dr. Strauss could not have been informed the information was "trade secret", as he avows. Moreover, none of the many documents produced as part of this litigation reveal any indication of Roche's "general practice" of informing researchers about confidentiality.

After listening to all the testimony and observing the demeanor of the witnesses, the Court credits Dr. Yoder's testimony that, upon agreeing to serve as a clinical investigator, he was not informed of any confidentiality requirement.[18] Specifically, the Court

18. The Court's resolution of the credibility issue is based on the appearance and conduct of the witnesses, the manner in which they testified, and by the character of the testimony given. The

finds that there was no agreement, written or oral, to keep these matters confidential.

### D. The Parties' Claims

Roche argues that the approximately 550 pages of documents at issue in this case contain the kind of "scientific or technical" information identified by the Trade Secrets Act as generally entitled to trade secret protection. Pl.'s Br. at 3 (Docket No. 38). The crux of Roche's argument is that these documents reveal how one company went about successfully conducting a clinical study to obtain quick FDA approval. Tr. 1 at 18. Roche directs this argument primarily to the third group of disputed materials—the correspondence between Dr. Yoder and Roche—and concedes that any one letter taken individually does not necessarily contain trade secret information. Tr. 1 at 23. Rather, says Roche, it is the body of the information that together conveys Roche's "formula" for conducting clinical research, and this formula constitutes a trade secret.

Roche also maintains that certain individual documents contain substantive information that is trade secret under the law. Those documents that are individually claimed to be trade secrets are listed as such in the last column of the Roche Index.

Dr. Yoder contends that Roche fails to carry its burden on each of the three prongs of the trade secret test. First, Dr. Yoder claims that these documents do not have any real independent value. While he concedes that the documents may have possessed some value in the late 1970s when Accutane was being developed, he maintains that 19 years later any such value is lost. Second, Dr. Yoder argues that the information contained in these documents has been published in various medical journals and reference guides over the past 15 to 20 years. Finally,

Dr. Yoder contends that Roche, both at the time he agreed to serve as a clinical investigator and over the past number of years, has not taken reasonable steps to protect the information, and thus has forfeited any claim to trade secrecy.

### II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

#### A. Trade Secret Protection Under Ohio Law

In 1994 Ohio joined more than thirty other states in adopting the Uniform Trade Secrets Act (hereinafter "Uniform Act").[19] Under the Ohio statute a trade secret is defined as:

(D) [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev.Code Ann. § 1333.61(D) (Anderson 1995). The Ohio Trade Secrets Act differs only slightly from the Uniform Act.[20] Remedies available to a plaintiff under the Ohio Trade Secrets Act include injunctive relief to enjoin actual or threatened "misappropriation" of a trade secret and the issuance of an order to compel "affirmative acts to protect a

---

Court also considered the motive, bias or prejudice, state of mind, and demeanor of each witness while on the stand.

**19.** The House of Delegates of the American Bar Association approved the Uniform Act in February, 1980. To date, 41 states and the District of Columbia have enacted some form of the Uniform Act. Melvin F. Jager, *Trade Secrets Law* § 3.05 (1996).

**20.** The introductory paragraph enumerating what information may constitute a trade secret is more expansive under the Ohio Trade Secrets Act than under the Uniform Act. The latter reads: " 'Trade Secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that ..." Unif. Trade Secrets Act, 14 U.L.A. 434 (1992).

trade secret." Ohio Rev.Code § 1333.62(A), (C). "Misappropriation" under the Ohio Act includes disclosure of a trade secret by a person who "knew or had reason to know that the knowledge of the trade secret ... was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use ..." Ohio Rev.Code § 1333.61(B)(2)(b).

Prior to 1994 Ohio protected trade secret information through two separate statutes— § 1333.51 and § 1333.81—each of which carried potential criminal sanctions. Section 1333.51, enacted in 1967, broadly defined trade secrets and was interpreted by the courts as an instrument to maintain standards of commercial ethics and the encouragement of invention. *See, e.g., Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (construing Ohio's trade secret law). In 1974 the Ohio legislature enacted a second, catch-all provision, prohibiting employees who obtain confidential information in the course of their employment from knowingly furnishing or disclosing such information. Ohio Rev.Code § 1333.81. On the day the legislature enacted the Ohio Trade Secrets Act, it also amended § 1333.51 to incorporate the definition of "trade secret" found in the new statute, § 1333.61.[21]

In addition to these statutory provisions, Ohio has adopted the definition of "trade secret" found in *Restatement (Fourth) of Torts* (1939), § 757 cmt. (b). *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.,* 24 Ohio St.3d 41, 44, 492 N.E.2d 814 (1986). The Ohio Supreme Court's adoption of the Restatement definition provided courts with two different—yet closely related—definitions of trade secrets to utilize in civil cases. *See R & R Plastics, Inc. v. F.E. Myers Company,* 92 Ohio App.3d 789, 799, 637 N.E.2d 332 (1993) ("Ohio courts have recognized two separate yet complimentary 'trade secret' definitions."). Moreover, the enactment of overlapping criminal statutes and common law principles has led both courts and commentators to conclude that Ohio

places a high value on protecting trade secret information.

## B. Roche's Claim of Trade Secrecy Under the Ohio Trade Secrets Act

■ Under Ohio law the question of whether a particular knowledge or process is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence. *Valco,* 24 Ohio St.3d at 48, 492 N.E.2d 814 (citing *Water Management, Inc. v. Stayanchi,* 15 Ohio St.3d 83, 86, 472 N.E.2d 715 (1984) (citations omitted)).

As numerous courts have recognized—and as the introductory text to the Ohio Trade Secrets Act acknowledges—there is no specific subject matter criterion for a trade secret. As long as the definitional elements are met, virtually any type of information can be a trade secret. *See* Michael A. Epstein, *Practical Implications Arising from the Trade Secret Definition, in Modern Intellectual Property,* ch. 1 (2d ed. 1992).

Over the past fifteen years Ohio courts have repeatedly looked to the same six factors to determine whether information meets the test of trade secrecy: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guarantee the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate information. *See, e.g., R & R Plastics, Inc.,* 92 Ohio App.3d at 801, 637 N.E.2d 332 (citing *Pyromatics, Inc. v. Petruziello,* 7 Ohio App.3d 131, 134–35, 454 N.E.2d 588 (1983)).

At least one commentator has acknowledged that the enactment of the Uniform Act was not meant to displace these well-developed common law precepts. Jager, *supra* at § 5.04[3][a][ii]. The Ohio Supreme Court—

---

**21.** The Court's research uncovered virtually no legislative history explaining the impetus behind

Ohio's adoption of the Uniform Act in 1994.

recognizing the factors set forth in *Pyromatics*—has focused on the two requirements that now make-up the heart of the Ohio Act: "the extent to which information is known outside the business and the precautions taken to guard against the secrecy of the information." *Water Management*, 15 Ohio St.3d at 86, 472 N.E.2d 715. *See also Valco*, 24 Ohio St.3d at 46–47, 492 N.E.2d 814. Accordingly, the Court will rely almost exclusively on Ohio case law interpreting the definition of "trade secret" under § 1333.51 and the Restatement of Torts to determine the meaning of "readily ascertainable" and "reasonable efforts" under the Ohio Trade Secrets Act.[22]

### 1. Independent Economic Value of the Information Sought

There is a paucity of Ohio case law addressing the issue of how courts should assess the economic value of information claimed to be trade secret. Other courts have held, however, that the fact a party is willing to pay a large price to acquire information is evidence of the value of such information. *See A.L. Laboratories, Inc. v. Philips Roxane, Inc.*, 803 F.2d 378, 381 (8th Cir.1986).

Although there is no evidence in this case that any party is willing to pay one cent for the contested documents, the Defendant himself has placed a rather high price tag on the items.[23] The Court thus finds—based largely on the Defendant's own valuation—that the first prong of the Ohio Trade Secrets Act is satisfied.

### 2. Relative Secrecy

■ The comments to the Uniform Act state:

Information is readily ascertainable if it is available in trade journals, reference books, or published materials. Often, the nature of the product lends itself to being readily copied as soon as it is available on the market. On the other hand, if reverse engineering is lengthy and expensive, a person who discovers a trade secret through reverse engineering can have a trade secret in the information obtained from reverse engineering.

Commissioners' Comments to § 1. Similarly, it is well established under Ohio law that information that is generally known in an industry is not "secret" and cannot be afforded trade secret protection. *See R & R Plastics*, 92 Ohio App.3d at 801–02, 637 N.E.2d 332 (citing *Wiebold Studio, Inc. v. Old World Restorations, Inc.*, 19 Ohio App.3d 246, 484 N.E.2d 280 (1985); *B.F. Goodrich Co. v. Wohlgemuth*, 117 Ohio App. 493, 192 N.E.2d 99 (1963)).

Dr. Yoder's argument under this prong is twofold. First, Dr. Yoder maintains that the information contained in the documents at issue has—over the past 15 to 20 years—been published in various pieces of medical literature. To the extent the exact documents have not been reproduced, claims Dr. Yoder, the underlying information could easily be obtained through reverse-engineering by a medical professional. Roche's position is that only the results of the studies and data—rather than the underlying documents themselves—have been made public. According to Roche any possibility of discovery through reverse engineering would involve tremendous time and cost.

The Court will examine, both individually and collectively, the relative secrecy of the

---

**22.** Plaintiff argues that, in determining the existence of a trade secret, the Court should consider consistent precedent from among the various states in order to effectuate the Uniform Act's general purpose "to make uniform the law." Pl.'s Mem. at 17 (Docket No. 37). The Court agrees that uniformity is a primary goal of the Uniform Trade Secrets Act, and to that end the Court considered the out-of-state case law cited by Plaintiff. What the court discovered, however, is that the existence or non-existence of a trade secret is an intensely fact-driven inquiry, and there are no cases, with that exception of that discussed *infra*, pp. 1359–60, that are direct-

ly on point. Moreover, the concepts that form the essence of the trade secrecy test under the Ohio Trade Secrets Act—relative secrecy and reasonable efforts by the possessor to maintain that secrecy—have been at the root of Ohio law for the past fifteen years. Accordingly, the Court's decision is guided primarily—although not exclusively—by Ohio law.

**23.** Of course, the $9.5 million asking price includes all of Dr. Yoder's collection—not just the documents at issue here—as well as the manuscript he authored on Accutane.

materials at issue and the merits of each side's position.

### (a) Protocols

■ Roche maintains that the information Dr. Yoder obtained from the NIH through a FOIA request are "dramatically different from the protocols that Roche seeks to protect from disclosure." Pl.'s Br. at 9 (Docket No. 38). The Court simply disagrees. For the reasons already discussed *supra*, p. 1353, the Court finds that the second protocol obtained from the NIH—Protocol 79–C–36—is virtually identical to Protocol 2109A at issue in this case.

With regard to Protocol 970, the Court finds that this document is similar—although not identical—to the NIH Protocol 76–C–64. However, Protocol 970 is described extensively in the Iowa Workshop Materials, particularly the article authored by Dr. Windhorst. Def.'s Ex. 7 at 708. In short, the Court is convinced that Protocol 970 has been so widely described and discussed in the medical literature, that, to the extent its exact provisions are not contained in NIH Protocol 76–C–64, it would not be difficult for a medical professional to discover through reverse engineering all of its salient features.

### (b) Investigational Drug Brochures

■ The three investigational drug brochures embody a continuum of knowledge regarding the effects and efficacy of Accutane. It is undisputed that the 1978 IDB (Doc. No. 35) has been declassified and made public as part of the *Hammock* litigation. Pl.'s Mem. at 1 (Docket No. 48). The Court finds that the 1978 IDB incorporates most of the information contained in its earlier version, the 1975 IDB. Moreover, Dr. Yoder's letter from the NIH indicates that although the 1975 IDB is not currently available through a FOIA request, it was at one time. *See* Def.'s Ex. 15, discussed *supra,* p. 8.

With regard to the most recent drug brochure, the 1982 IDB, Dr. Yoder testified that the overwhelming majority of this information is contained in medical and scientific publications. Once again, the Court has carefully reviewed the medical literature references cited by Dr. Yoder in support of his contention. Although most of the 1982 IDB

information is referenced and/or generally described elsewhere, the IDB itself is clearly more detailed. Moreover, unlike the 1975 and 1978 IDB and Protocol 2109A, Dr. Yoder offered no public source that virtually duplicates the 1982 IDB. Thus the Court concludes that the second prong of the Ohio Trade Secrets Act is satisfied vis-a-vis the 1983 IDB (Doc. No. 3). However, the Court finds that both the 1975 and 1978 IDB (Doc. Nos. 1–2) are generally known and readily available elsewhere, and thus the second prong is not satisfied with regard to those documents.

### (c) Correspondence

The issue with respect to the correspondence is not whether the various letters are publicly available, but rather whether the methods and devices for conducting a clinical trial—that Roche claims are embodied in the correspondence materials—are a "secret" within the medical research community.

■ As a matter of Ohio law, it is not generally necessary in a trade secret case to establish the element of novelty that is required in the law of patents. Ohio courts have consistently held, however, that at least some novelty is required to support a claim for trade secret infringement. *See, e.g., Murray v. Bank One,* 64 Ohio App.3d 784, 789, 582 N.E.2d 1124 (1990) (citations omitted); *Wiebold Studio, Inc.,* 19 Ohio App.3d at 249, 484 N.E.2d 280.

At least one other Court has grappled with the issue of whether a pharmaceutical company's clinical trial method may be protected as "trade secret" information. In *Pfizer, Inc. v. ICI Americas, Inc.,* 1984 WL 8262 (Del. Ch., Nov. 21, 1984) the Court was asked to decide whether a key figure in Pfizer's clinical trials of the diabetes drug sorbinil should be enjoined from heading up a clinical study of a new class of similar drugs at a competitor corporation. Pfizer argued that the knowledge the defendant obtained while at Pfizer regarding "the best ways to conduct the clinical testing of an aldose reductase inhibitor" constituted trade secrets of the company. *Id.* at *4. The facts revealed that the defendant, Dr. Laudadio, had signed a written confidentiality agreement with Pfizer

and thus did not intend to disclose to ICI the makeup of sorbinil, its side effects, its effectiveness, etc. *Id.* The sole issue was whether the clinical testing and know how obtained by Pfizer over years of trial and error constituted trade secrets.

In opposition to Pfizer's motion for a preliminary injunction ICI offered the testimony of four research physicians. *Id.* at *5. Each of the four were participants in the Pfizer study as well as other studies conducted by other pharmaceutical companies. *Id.* Each testified that the methods and techniques claimed to be trade secret were information that was generally known in the medical profession or was readily available by legitimate means from sources independent of Pfizer. *Id.*

The test for trade secrecy under Delaware law was whether the information claimed to be trade secret derived independent economic value from not being generally known or readily ascertainable by others. *Id.* at *8.[24] The Court, deciding the issue under a preliminary injunction standard, found that weight of the evidence showed that Pfizer's "method" of conducting clinical trials was generally known or readily ascertainable by individuals in the medical profession. *Id.* at *10.

■ The Court finds the *Pfizer* opinion instructive. Here too, Roche claims that its "method" of conducting clinical trials constitute trade secrets under the law. In essence there are two issues for the Court: whether the documents themselves reveal any such method and if so, whether that "method" is generally known in the medical field. With regard to the first inquiry, the Court has grave doubts—after reviewing all 330 pages of correspondence—as to whether they actually convey a method. However the Court is convinced that even if these documents reveal a method, such method is generally known in the medical profession.

As both the *Pfizer* opinion noted and the testimony in this case revealed, clinical research physicians can and do conduct clinical trials on many different drugs for many different pharmaceutical companies. To the ex-

tent any one company's method varies from the next, hundreds or perhaps thousands of physicians across the country know about it—and are at liberty to discuss these differences with whomever they choose.

### (d) Conclusion

In sum, the Court finds that the protocols at issue are readily ascertainable through public sources as are two of the three contested drug brochures. Although there is no direct public source for the disputed correspondence, the Court finds that, to the extent any trade secret "method" is embodied in such documents, such method is generally known in the medical profession.

### 3. Reasonable Efforts to Maintain Secrecy

■ There is no presumption that any particular idea imparted to or acquired by an employee is a trade secret unless the possessor takes active steps to maintain its secrecy. *Water Management, Inc.,* 15 Ohio St.3d at 85–86, 472 N.E.2d 715. The Ohio Supreme Court reaffirmed this principle in *Valco,* stating, "a trade secret cannot be acknowledged as such unless the manufacturer has initiated measures designed to ensure the security of those things considered trade secrets." *Valco,* 24 Ohio St.3d at 46–47, 492 N.E.2d 814. *See also Sonkin & Melena Co., L.P.A., v. Zaransky,* 83 Ohio App.3d 169, 182, 614 N.E.2d 807 (1992) ("A party claiming a trade secret must take affirmative steps to protect whatever information it deems secret before relief can be granted.")

■ At trial, Roche presented testimony and evidence regarding the present day controls placed on these documents and the various protective orders Roche obtained during the 1980s to keep these documents confidential. Tr. 1 at 58, 178; Pl.'s Exs. 3a and 3e. The Court is convinced that, within the last ten years or so, Roche has taken extraordinary efforts to keep this material confidential. What is striking to the Court, however, is the absence of evidence regarding controls placed on these documents when

---

**24.** The opinion does not seem to indicate that "reasonable" steps to maintain the secrecy of the

information were a requirement of Delaware law.

the Accutane trials were initiated, and in the years directly thereafter.

In short, the Court finds Roche's security measures unreasonable in each of the areas discussed below.

### (a) Absence of a written or oral agreement

It is undisputed that the parties never entered into a written agreement. Roche presented testimony however, that the practice in the industry at the time was not to sign written confidentiality agreements. Pl.'s Ex. 11 (Pochi Dep.) at 11; Pl.'s Ex. 12 (Krueger Dep.) at 8–9; Tr. 2 at 86–87. The standard under the Ohio Trade Secrets Act is one of reasonability under the circumstances, and the Court finds that the custom of the industry certainly influences what is reasonable. The Court's research, however, uncovered at least one example of a clinical investigator for a pharmaceutical company, Pfizer, executing a confidentiality agreement in 1981 upon commencement of his employment. *Pfizer*, 1984 WL 8262 at *4. Nevertheless, the absence of a formal, written, confidentiality agreement is not determinative of the Court's decision in this case. *But cf. Penetone Corporation v. Palchem, Inc.*, 627 F.Supp. 997, 1006 (N.D.Ohio 1985) (anyone with direct or indirect contact or exposure to the formulas signed a secrecy agreement); *Chemclear, Inc. v. Ameriwaste Environmental Services, Inc.*, 1992 WL 166548 at *6 (Ohio App. 8 Dist., 1992) (defendants neither had been requested to nor had signed any agreement with Chemclear concerning trade secrets).

The Court finds, however, for the reasons set forth *supra*, pp. 1354–55, that there is also insufficient evidence of any type of oral confidentiality agreement. This conclusion is bolstered by the complete absence of any mention of confidentiality in the written documents submitted to the Court.

For example, in a letter to Dr. Yoder dated May 11, 1977, Dr. Windhorst describes the various steps necessary to start participating in the Accutane trials.

> To that goal I have included a copy of Form FD1572 which you should complete and return to me with a recent curriculum vitae: also attached are the Investigational Drug Brochure and Case Report Form. I will need a budget from you and a copy of the normal ranges and certification of your clinical laboratory: in addition, a notification of approval from your Institutional Review Committee should be forwarded to us.

Doc. No. 5. These steps mirror what Dr. Windhorst testified was included in the written clinical manual that Roche is unable to locate. *See supra*, n. 15. What is missing from the letter—yet what Dr. Windhorst testified was contained in the manual—is any mention of confidentiality.

Similarly, the cover letters to Dr. Yoder enclosing various amendments and revisions to Protocol 970 fail to mention anything about confidentiality. *See* Doc. Nos. 8, 31, 32, 49, 95, 142, and 153. This is also true of the cover letters reflecting changes in the IDBs. See Doc. Nos. 79, 93, 94, 98, and 111. Finally, the written evidence shows that sixteen different persons from Roche sent approximately 97 letters to Dr. Yoder over a six year period. Only one—written six years after he agreed to be a clinical investigator and soon after he published an article critical of Roche—ever mentioned confidentiality.[25]

### (b) Absence of facial markings indicating confidentiality

A review of the legal literature reveals that one of the primary facets of a trade secret document control policy is some kind of facial

---

25. The letter reads, in relevant part:
It has come to our attention that a recent publication cites information from one of our investigational drug brochures (IDB). We would like to clarify and emphasize that the IDB provided to you at the initiation of a study is a *confidential Roche document*. It and/or its contents may not be used for any oral or written presentation.

Letter to Dr. Yoder from Jeanne Lesiewicz, May 26, 1983, (Doc. No. 160) (emphasis in original). It is interesting to note that the language of the letter speaks of "clarifying" rather than "reminding" or "reiterating" Roche's position regarding trade secrecy.

indicia indicating that the document is in fact confidential.[26]

Of the approximately 550 pages submitted to the Court only three are stamped confidential.[27] Dr. Windhorst attempted to explain the absence of any such markings, except on the front page of the IDBs, by stating, "the Investigational Drug Brochure was marked that way, and I think that was principally because it was required to be sent to the Ethics Review Committee ..." Tr. 1 at 54. The Court interprets Dr. Windhorst's reference to the "Ethics Review Committee" as a reference to the Institutional Review Committees, discussed *infra*. The record is clear, however, that the protocols and various other pieces of correspondence were also forwarded—at Roche's request—to the various Review Committees. *See infra,* n. 29. Dr. Windhorst's explanation is thus not credible and the Court is left to consider the objective fact that only three of the 550 contested pages in this lawsuit are marked confidential.

### (c) Wide-spread dissemination of the materials

The need for some form of written or oral confidentiality agreement and/or facial indicia of confidentiality is exacerbated by the wide-spread distribution of these materials.

The record reveals that there were approximately 19 research centers across the country involved in the Accutane trials. Letter to Dr. Yoder from Dr. Windhorst, December 1, 1980 (Doc. No. 110) ("As you may have surmised, it is now expected that the combined findings from the 19 centers that have participated in Protocol 970 ..."). The total number of clinical investigators undertaking Accutane research at these centers is unclear, although the number may be as high as 40.[28] Moreover, each research center shared information with an Institutional Review Committee (hereinafter "IRC"), which was comprised of approximately another ten individuals.[29] The record thus shows that the substantive information at issue in this case—the protocols, IDBs, and pieces of substantive correspondence—were distributed in the late 1970s to more than 200 people nationwide.

### (d) Lack of internal and external controls

■ A number of Ohio cases address the internal and external controls that warrant a finding of "reasonable" security measures. *See R & R Plastics,* 92 Ohio App.3d at 804, 637 N.E.2d 332 (surveying Ohio case law on the issue of reasonable security measures). Such measures include: denial of plant access to employees, limiting admittance through a buzzer lock system, maintaining files in a locked and secure area, restricting the use and disclosure of information to outsiders and placing proprietary markings on such information. *See Pyromatics,* 7 Ohio App.3d at 135, 454 N.E.2d 588; *Valco,* 24 Ohio St.3d at 47, 492 N.E.2d 814; *Chemclear Inc,* 1992 WL 166548 at *6.

---

**26.** *See generally,* M. Margaret McKeown, *Trade Secret Enforcement in the United States,* 9 SPG Int'l L. Practicum 22, 24 (1996); Roger Norman Coe, *Keeping Trade Secrets Secret,* 76 J. Pat. & Trademark Off. Soc'y 833, 836 (1994) ("Fundamental to many of these procedures is confidential stamping: marking sensitive documents with an unmistakable label like 'Confidential', 'Do Not Copy", or 'Trade Secret.' "); Daniel P. Powell, *An Introduction to the Law of Trade Secrets,* 23 Colo.Law. 2125, 2127 (1994) ("It is of utmost necessity in implementing any trade secrets protection program to mark all internal memoranda, manuals, drawings, blueprints, schematics, software, floppy diskettes, tape cartridges or any other item that may contain a business's trade secret information, as being 'confidential.' ").

**27.** The word "Confidential" is typed on the cover pages of each of the IDBs, near the top of the page. Roche Bate Nos. FY000002, FY000023 and FY000079.

**28.** Dr. Yoder testified that he had two co-investigators working with him on the trials, Dr. Flowers and Dr. Gray. Tr. 2 at 120. Dr. Windhorst listed 38 individuals as participants in the Accutane trials in her article on keratinization. Def.'s Ex. 7 at 708.

**29.** Roche required the clinical investigators to share the Accutane protocols and IDBs with their IRC. Tr. 1 at 162. In fact, Roche often enclosed an extra copy of materials sent to researchers for them to share with their IRC. *See* Letter to Dr. Yoder from Dr. Windhorst, May 8, 1981 (Doc. No. 115) ("An extra copy [of rat toxicology studies] is provided for your Institutional Review Committee."). Dr. Windhorst testified that, although each IRC varied, she estimated that the average Committee would consist of "around 10 people." Tr. 1 at 163.

Dr. Windhorst testified regarding Roche's internal document control procedures in the 1970s and early 1980s. She stated that "there was a document retention policy" under which documents remained in her files while they were still in draft form. Tr. 1 at 53. She added that her files were "in a building that was on the campus that no one who was not an employee of Roche could approach without being escorted by an employee of Roche." *Id.* Once the document became official, it was "kept in some kind of a carefully—it's like a library. They are logged in, where they are and what they mean and all of those things." *Id.* Quite simply, Plaintiff's representations that "[a]t all relevant times, confidential documents were locked and/or stored in a safe and secure manner at Roche", Pl.'s Mem. at ¶ 33 (Docket No. 37), is not borne out by Dr. Windhorst's testimony.[30]

Aside from the internal controls, Roche maintains that it took essentially five steps to maintain the confidentiality of its documents vis-a-vis its clinical investigators: (1) discussing confidentiality at the outset with each of its clinical investigators, (2) periodically sending out clinical research associates, such as Joyce Coutinho, to remind investigators of confidentiality, (3) holding yearly conferences—coinciding with the annual meeting of the American Academy of Dermatology—at which Roche reminded the investigators of confidentiality, (4) holding special meetings with only Accutane investigators where confidentiality was discussed, and (5) maintaining such standards after Accutane was marketed. Pl.'s Br. at 11–12 (Docket No. 38).

The Court finds that the testimony and written evidence belie nearly every one of Roche's assertions. It is unrefuted that Ms. Coutinho was not assigned to work with Dr. Yoder on Protocol 970, and thus her testimony regarding her own visits and admonishments about confidentiality to clinical in-

vestigators is not relevant to Dr. Yoder's circumstance. Moreover, the one example of a "special meeting" with Accutane clinical investigators cited by Ms. Coutinho occurred in 1977—and Ms. Coutinho testified she was unsure whether Dr. Yoder in fact attended. Tr. 1 at 46.

Both Drs. Krueger and Pochi testified that, as participants in the 1981 Iowa Conference on Retinoids, they do not recall being told that any of the information they were receiving or learning about Accutane was confidential. Pl.'s Ex. 11 (Pochi Dep.) at 18–19; Pl.'s Ex. 12 (Krueger Dep.) at 21. Roche offered no testimony of either physician regarding its claim of holding "special meetings" or discussing confidentiality at annual conferences—only the testimony of their long-time employee Ms. Coutinho. Pl.'s Br. at 12 (Docket No. 38).

**(e) No system of document retrieval**

After disseminating these largely unmarked materials across the country, Roche had no policy of trying to retrieve such documents. Tr. 1 at 167.

Roche responded to this contention by presenting testimony that physicians were required to maintain records as long as patients participated in the study, which sometimes could be years. Nevertheless, Roche had no controls to retrieve documents from the Review Committees or from the physicians themselves once their patients completed their participation in the study.[31] To this day Roche would not be able to identify or locate within the country all the copies of the documents that are claimed to be trade secret in this lawsuit.

Moreover, Roche's written correspondence reveals that it did take steps in other areas to retrieve and/or control the disposition of its property. In a letter to Dr. Yoder dated March 23, 1983, Jeanne Lesiewicz wrote: "As of this date, no Ro 4–3780 (Accutane) is

---

**30.** By contrast, Dorothy Holland, Roche's Senior Manager of Drug Regulatory Affairs, testified that currently such documents "[A]re kept in a locked secure file. We have a secure file with limited access to department members under a pass key." Tr. 1 at 178.

**31.** Roche's own witness, Dr. Krueger, in response to a question by Plaintiff's counsel as to his belief if Roche should have to ask for its documents back from investigators, stated "No, you know, as long as they're destroyed as per the agreement." Pl.'s Ex. 12 (Krueger Dep.) at 28–29. In this case there was not only no agreement, there was no request.

to be returned to Hoffmann–La Roche. All out-of-date or excess drug supplies, whether empty, partial or full, are to be destroyed in an appropriate manner (crushing or incineration) at your facility." Doc. No. 160.

### (f) No warnings in response to written articles

Finally, the uncontroverted testimony was that Dr. Yoder wrote and published at least two articles about Accutane prior to 1983 without hearing a word from Roche regarding the propriety of publishing such "confidential" information.

The first article, published in the Lancet on November 27, 1976, and co-authored by Dr. Gary Peck cited to the 1972 Roche IDB in footnote 2 of the article. Def.'s Ex. 11; Tr. 2 at 115–16. Dr. Yoder testified that he did not receive prior permission nor did he hear any complaints from Roche about disclosing confidential information. *Id.* at 116.[32]

The second article co-authored by Dr. Yoder appeared in the *New England Journal of Medicine* on February 15, 1979. Def.'s Ex. 12. Once again, Dr. Yoder heard nothing from Roche regarding disclosure of confidential information. Tr. 2 at 122–124.

### (g) Conclusion

Thus, for all of the reasons cited above, the Court finds that Roche did not take reasonable efforts to maintain the secrecy of the contested documents at the time the Accutane trials were initiated, and in years directly thereafter. The third prong of the Ohio Trade Secrets Act is therefore not satisfied.

### C. Common Law Duty of Confidentiality

■ In addition to the statutory prohibition against disclosure of trade secrets, Roche claims that Dr. Yoder has an Ohio common law duty not to disclose Roche's

trade secrets he obtained while serving as a clinical investigator for Roche.

At the outset the Court notes that it is unclear whether such a common law cause of action persists under Ohio law. Section 1333.67 of the Ohio Trade Secrets Act specifically states that conflicting tort, restitutionary and other civil remedies for misappropriation of a trade secret are displaced by the Act.[33] Although the statute excludes from its displacement any contractual remedies, it is doubtful that the century old common law doctrine relied on by Plaintiff may be properly classified as a "contractual remedy". In fact, a number of Ohio courts deciding claims of trade secrecy under the Restatement definition have held that such actions are grounded in tort law, which § 1333.67 specifically displaces. *See e.g., USM Corporation v. Tremco Incorporated,* 710 F.Supp. 1140, 1142 (N.D.Ohio 1988); *Guardian Pest Control, Inc. v. Mulholland,* 1993 WL 204633 at *2–3 (Ohio App. 8 Dist., 1993).

Nevertheless—even if the Court were to conclude that such a common law action persists—Plaintiff's claim fails for the same reasons it did under the Ohio Trade Secrets Act; Plaintiff's failure to reasonably safeguard the information it now claims as trade secret and the public availability of the contested information. Plaintiff's claim is therefor **DENIED.**

### D. Replevin

■ Finally, Plaintiff seeks replevin of the contested documents under Ohio Rev. Code § 2737.03. The Defendant argues that any such claim is time barred under the four-year statute of limitations applicable to replevin actions.

**32.** Six years later, however, Roche took the position that its IDB may not used for "any oral or written presentation". *See supra,* n. 25.

**33.** Ohio Revised Code § 1333.67 states, in relevant part:
(A) Except as provided in division (B) of this section, sections 1333.61 and 1333.69 of the Revised Code displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.

(B) Sections 1333.61 to 1333.69 of the Revised Code do not affect any of the following:
(1) Contractual remedies, whether or not based on misappropriation of a trade secret;
(2) Other civil remedies that are not based on misappropriation of a trade secret;
(3) Criminal remedies, including those in other sections of this chapter, whether or not based on misappropriation of a trade secret. .

The statute of limitations applicable to replevin actions, Ohio Rev.Code § 2305.09, provides that:

> An action for any of the following causes shall be brought within four years after the cause thereof accrued:
>
> . . . .
>
> (B) For the recovery of personal property, or for taking or detaining it.

Ohio Rev.Code Ann. § 2737.03 (Anderson 1995). The Sixth Circuit has held, however, that an action for recovery of personal property does not accrue until the plaintiff has actual or constructive notice that the defendant is in possession of its property wrongfully. *Charash v. Oberlin College,* 14 F.3d 291, 299 (6th Cir.1994). Accordingly, Roche claims that its cause of action did not accrue until January, 1996, when Dr. Yoder informed Roche of the auction.

For the reasons already stated the Court finds that Dr. Yoder is not in "wrongful" possession of the documents at issue and thus the tolling provision of § 2305.09 does not rescue Roche from the four-year statute of limitations. The Court thus finds Roche's replevin claim time-barred under Ohio law.

### III. CONCLUSION

Under the Ohio Trade Secrets Act a party claiming trade secrets must show that the information: (1) has independent economic value, (2) is not generally known or readily ascertainable by independent means, and (3) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

There are three categories of information at issue in this case: protocols, investigational drug brochures, and correspondence. With regard to all three categories of information the Court finds that Roche did not—both at the time it initiated the Accutane clinical trials and in the years immediately thereafter—take reasonable steps to maintain the secrecy of the information. Moreover, the Court finds that each of the two protocols at issue, two of the three investigational drug brochures, and the body of the correspondence is generally known or readily ascertainable by individuals in the medical

profession. Accordingly, Roche's claim for injunctive relief is hereby **DENIED.**

**LET JUDGMENT STAND IN ACCORDANCE WITH THE FOREGOING.**